Fuld, J.
 

 The defendant was convicted of crimes of forgery and larceny and a closely divided Appellate Division affirmed the resulting judgment. The evidence being more than ample to support the jury’s verdict, our sole problem is to determine whether prejudicial error was committed which requires reversal and a new trial.
 

 The record establishes that the defendant, who shared an apartment in Eoehester with William Trimmer, appeared at the office of the Beneficial Finance Co. in that city on August 3,1961, and obtained a loan of $400; he posed as Trimmer, exhibiting several of the latter’s cards — a Social Security card, a credit card issued by Beneficial and a card from the Genesee Hospital as employer — and signed Trimmer’s name to an application for a loan, an assignment of wages and a promissory note. It was Trimmer’s testimony that ho knew nothing about the transaction; that he had not made any arrangements with the Beneficial Finance Co. for a loan; that he had not given the defendant any identification cards; and that he had not authorized him to borrow money from Beneficial or to sign his name to any papers. He learned of the transaction for the first time on August 11 when, he said, he telephoned to the finance company to ascertain whether he could obtain a loan for himself and was told that he had already borrowed $400. According to Trimmer, the defendant had removed his cards from a bureau drawer in which he had kept them. After learning that the defendant had borrowed money in his name, Trimmer complained to the authorities.
 

 The defendant, taking the stand in his own defense, admitted that he had signed Trimmer’s name to the documents in question and that he had obtained the loan from Beneficial but he declared that Trimmer had authorized him to do what he did. Trimmer and he were friends and, the defendant testified, when, in July or August, 1961, he needed money to purchase an automobile, he asked Trimmer to co-sign a note with him so that he might borrow the necessary cash. Trimmer told the defendant that he
 
 [1]
 
 ‘ would get a loan for [him, the defendant] in his own [Trimmer’s] name ” at Beneficial, where he had established
 
 *40
 
 credit and that the defendant could repay him directly. However, when the day appointed for the making of the loan arrived, Trimmer, stated the defendant, found himself unable to go to the finance company and, accordingly, suggested that the defendant go “ in his stead ”, sign his name and ‘
 
 [1]
 
 pick up the money ’ ’. More particularly, the defendant continued, Trimmer gave him a plastic cardcase containing a number of identification cards and, armed with Trimmer’s authorization and his cards, he went to the office of the finance company, signed Trimmer’s name to the various papers presented to him and received the sum of $397.03 in cash from the company. He later returned the identification papers to Trimmer and advised him, in response to his query, that everything had gone as planned.
 

 The defendant used the money to purchase a car and does not appear to have concealed his movements. He spent the week traveling on business in the area around Ithaca, returned to Rochester on the following Saturday at about 4:30 a.m. and went to the apartment (which he had shared with Trimmer) where he remained for the balance of the night. Although they spoke with each other, Trimmer did not say a word about the loan transaction or about his having filed a criminal complaint against him. He left the apartment for work at about 9 o’clock and was arrested later that morning.
 

 Following his arrest, the defendant made a statement to the police in which he fully implicated himself, declaring that he had removed Trimmer’s identification cards from a drawer in their apartment, that he had gone to Beneficial’s office, posed as Trimmer, signed the latter’s name to various papers without his permission or knowledge and obtained the money with which he purchased an auto. He later repudiated his confession, claiming that he made it after being advised that, if he admitted that he had obtained the loan without Trimmer’s authority, it would “absolve” Trimmer of responsibility and that the finance company would substitute him, the defendant, as the borrower and place the loan in his name, with the automobile being taken as security; ‘ ‘ the case, ’ ’ the defendant said he was told, ‘ ‘ would be disposed of in that manner ’ ’.
 

 As is manifest, whether the verdict was to be one of guilt or of acquittal depended upon the jury’s determination as to whether Trimmer or the defendant was telling the truth. Was
 
 *41
 
 Trimmer to be believed when he asserted that he had not authorized the defendant to use and sign his name to consummate the loan or was the defendant to be credited when he insisted that he had received Trimmer’s authorization? This being the case, it was vital that nothing be done by the court or prosecutor to improperly affect the defendant’s veracity or credibility.
 

 The defendant, during his direct examination, admitted that he had been convicted in 1957 of attempted grand larceny. Upon cross-examination as to whether he had also been convicted in 1944 while in the military service, under a name other than Duncan, of “ a violation of Article of War 93 ”, the defendant replied that he had not. The prosecutor continued his questioning about “ the conviction of Article of War 93 ” and, then, over objection, several times asked the defendant whether he “ still ” persisted in “categorically” denying that conviction “even though the fingerprint records [sent from the Department of Justice in Washington] indicate ” that he had been so convicted.
 

 These repeated references to the defendant’s fingerprint record amounted, as the dissenters below remarked, to an “ assumption of facts not in evidence ” and constituted error. Indeed, the district attorney acknowledges that the interrogation may have been error but urges that, if it was, it was ‘1 inconsequential ’ ’. Although we fully recognize that the district attorney’s examination is not to be foreclosed by a negative reply (see
 
 People
 
 v.
 
 Sorge,
 
 301 N. Y. 198), he is not permitted to suggest, by referring to an alleged fingerprint record, that the defendant’s denial that he had been convicted was false. (See
 
 People
 
 v.
 
 McCormick,
 
 303 N. Y. 403.) In the
 
 McCormick
 
 case (303 N. Y. 403,
 
 supra),
 
 after observing that, while ‘ ‘ the rule is clear that cross-examination upon collateral matters may not be fobbed off by a negative response * * *, [it] does not sanction either ‘ the calling of other witnesses or
 
 *
 
 * * the production of extrinsic evidence ’ to refute the witness’ answer on such collateral items
 
 [People
 
 v.
 
 Sorge,
 
 301 N. Y. 198, 201] ”, we went on to hold that the prosecutor’s act of confronting the defendant with a written statement, purportedly made by him, from which he read inculpatory material tending to refute his earlier denials, ‘1 not only rendered such denials futile but amounted to the production of extrinsic evidence within the meaning of the rule here involved ” (303
 
 *42
 
 N. Y., at p. 404). “In short,” we concluded, “ the cross-examination complained of exceeded all permissible limits ” and required reversal.
 

 By the same token, the district attorney’s reference to such extrinsic evidence as fingerprint records which allegedly established that the defendant had been convicted of an Article of War offense “ rendered [his] denials futile ” and stamped him as a liar. We cannot, of course, say with any degree of certainty what influence (if any) the prosecutor’s repeated suggestion had upon the jurors but, since it is more than likely that they credited his intimations, they may have concluded that, if the defendant lied about his conviction, he also lied in testifying that Trimmer had authorized him to sign his name. Since, then, one cannot say that the prosecutor’s impermissible cross-examination did not affect the jurors’ appraisal of the defendant’s credibility and thereby influence them in reaching their verdict, the error may not be labeled harmless. (See, e.g.,
 
 People
 
 v.
 
 Rosenfeld,
 
 11 N Y 2d 290, 297
 
 et seq.; People
 
 v.
 
 Jackson,
 
 7 N Y 2d 142;
 
 People
 
 v.
 
 McCormick,
 
 303 N. Y. 403, supra;
 
 People
 
 v.
 
 Carborano,
 
 301 N. Y. 39;
 
 People
 
 v.
 
 Mleczko,
 
 298 N. Y. 153.)
 
 [1]
 

 The judgment appealed from should be reversed and a new trial ordered.
 

 Chief Judge Desmond and Judges Dye, Van Vooehis, Burke, Foster and Sctleppi concur.
 

 Judgment reversed, etc.
 

 [1]
 

 . While the point was not preserved for our review by adequate exception (Code Grim. Pro., § 420-a), it is not amiss to note, since there is to be a new trial, that we agree with the dissenting justices in the Appellate Division that the defendant’s requested charge on specific intent should have been given. (See, e.g.,
 
 People
 
 v.
 
 Wiman,
 
 148 N. Y. 29;
 
 People
 
 v.
 
 Weaver,
 
 177 N. Y. 434.)