THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL NAPOLETANO and MICHAEL B. (ANONYMOUS), Appellants.

Second Department, June 13, 1977

---

*Irving Anolik* for appellants.

*Carl A. Vergari, District Attorney (Stanley Levine* and *Joseph Aviv* of counsel), for respondent.

SHAPIRO, J. Defendants appeal from respective judgments of the Supreme Court, Westchester County, rendered October 27, 1976 as to Napoletano and November 5, 1976, upon resentence, as to Michael B., convicting Napoletano of the crime of attempted arson in the second degree and adjudicating Michael B. a youthful offender, upon his conviction of the same crime, and imposing sentence. The judgments are reversed and a new trial ordered.

### THE FACTS.

The premises which the two defendants, youths in their late teens, were charged with attempting to burn were Nathan's Famous Restaurant in Yonkers, New York, at Central Avenue and Crisfield Street. The sole eyewitness testimony against them came from Howard Bloom, a manager at the restaurant. He testified that he saw them engaged in the acts which resulted in their conviction. His testimony was that at about 1:15 A.M. on May 23, 1975, while he was closing out the cash registers in Nathan's, which had closed at 12:00 midnight, he heard glass breaking and looked outside the restaurant. He saw two young men walking across the porch area of the restaurant, which is 40 to 60 feet in length, pouring a liquid out of a red can which had a round bottom and a spout at the top. Bloom was about 60 feet from the two youths when he first saw them. Bloom ran from the counter to the doorway, stopping near the door at a point 10 or 15 feet from the defendants. He observed them for 10 or 15 seconds. He watched them walk down the steps of the porch, continuing to pour liquid from the can as they did so.

When the defendants looked up and saw Bloom approach-

ing, they ran across Crisfield Street into an apartment complex across from Nathan's. Bloom testified that during the time he observed the defendants he had a clear view of them and that the light was fairly good as half the lights inside of Nathan's were on and there was a street light nearby.

Bloom also testified that he called to the other manager, who was inside the office, to phone the police and he remained standing in the doorway. Soon thereafter he saw a small blue car come out of the apartment complex, drive down Crisfield Street and go by him slowly, and stop at the red light at Central Avenue and, when that light turned green, make a left turn onto Central Avenue. The two youths in it looked like those he had seen on the porch. The taller youth looked like the one he had seen on the porch, though he was in a T-shirt instead of the jacket he had been wearing when he was on the porch. He was seated on the front passenger side of the blue car.

The police arrived a few minutes later and Bloom gave them a description of the two youths. One, the shorter, was about 16 or 17 years old, with mod-length hair, 5 feet and 6 or 7 inches tall, and wore a white T-shirt with writing and a picture on it. He had been carrying the can. The second was 6 feet tall, a little older, about 18 or 19 years old. He was wearing a dark jacket and had longer hair pushed behind his ears. Bloom testified that the police then examined the liquid and got into their car and left, returning some 10 or 15 minutes later, followed by the blue car Bloom had earlier seen leaving the apartment project. When the police and the two youths got out of their respective cars, Bloom saw them and said: "Those are the two."

The second witness for the People was Yonkers Police Officer Rasulo, one of the two officers who had responded to the call from Nathan's. His testimony was that he and his partner spoke to Bloom, who told them what he had seen, described the two youths he had seen and told them about the small blue car he had seen later containing the defendants. The officers then checked the porch and observed and smelled a 45-foot length of gasoline saturation on the upper part of the walk and on the porch; they made a search of the area but could find neither the defendants nor the gas can. While Officer Rasulo was standing outside the radio car on the sidewalk, he saw a small blue car approaching slowly on Central Avenue. It speeded up after the two occupants saw

the group at Nathan's. He then called his partner and they gave chase in their police car and stopped the vehicle and asked the driver, defendant Michael B., for his license and registration. While so doing, Officer Rasulo noted a strong odor of gasoline inside the car; when he questioned the car's occupants about it, he was told that they had worked on a car at 8:00 or 9:00 o'clock at defendant Napoletano's house. The officer then asked the defendants to follow them back to Nathan's. They did so. *The officer then testified that when they emerged from their car at Nathan's, Bloom "blurted out that that's the two and that's the car."* The defendants were then placed under arrest and advised of their rights. Before they were placed, handcuffed, in the patrol car, Officer Rasulo's partner, Police Officer Leinen, searched the defendants and found two books of matches in Napoletano's right hand pants pocket and, when he touched the bottom of his trousers, found that the bottom four inches were damp and smelled of gasoline. When he and his partner searched defendants' car, they found a gray coat lying on the back seat behind the passenger side.

The next witness for the People, Patrolman Leinen, corroborated his partner's testimony as to what they had been told by Bloom, the gasoline which their inspection showed had been spread at Nathan's on the south side of the building, the unsuccessful search for the gas can, the observation of the blue car with two occupants approaching on Central Avenue and of the pursuit of the vehicle, the questioning of its occupants, their return to Nathan's, *the identification of the defendants and of their car by Bloom* and the arrest and search of the defendants and the car after they were advised of their rights.

The defense offered the testimony of two alibi witnesses, Napoletano's younger brother Anthony, and Mark Chiulli, a friend of both defendants, who testified that both defendants had been working on a car in Napoletano's private garage and were elsewhere at the time of the crime. Both defendants also testified in their own defense. Napoletano testified that he and Michael B. had worked at his garage on the night of May 22, 1975 until about 12:00 or 12:30 A.M. on the morning of May 23. They worked on an old roadster which he had bought as a kit for completion of its assembly, they had put gas in it and got it running and then found a leak in the fuel line and replaced that line. At about 12:50 A.M. they left and went to Andy's

Delicatessen on Central Avenue in Yonkers and stayed there for about a half hour. While there he had seen one of his alibi witnesses, Mark Chiulli, who left at about 1:30 A.M. He denied that he had worn a jacket, stating that he had been wearing his blue gas station shirt, which he had worn all evening and when he went out later with Michael B. He also testified that during the time he and Michael B. were working on the roadster, a friend of his, George Raffaeli, had stopped in and stayed about half an hour or 45 minutes and then left. After Chiulli left he and Michael B. "hung around" Andy's Deli and then left, driving up Central Avenue. As they slowed down for the light near Nathan's, they saw a police car there with one officer in the car and the other on the stairway. When the light changed they continued up Central Avenue; the police pulled them over as they were making a U-turn in order to go back down Central Avenue. They then followed the police back to Nathan's where, when they emerged, Bloom came over and said: "That's them". He denied the charges against him and said that when Police Officer Leinen had asked them why he smelled of gas, he had replied that he always smelled of gas. He had testified that he worked at a gas station. He had told the officer they had just been working on his car.

Michael B. testified to the same general effect as did Napoletano as to the events of the evening of May 22 and the early hours of May 23. He also denied ever having thrown gasoline on any property belonging to Nathan's or any place around it, or having had a gas can with him on that night.

The defense's last witness was George Raffaeli, an auto mechanic who knew both defendants. He testified that he was. at Nathan's on the night of May 22, 1975 at about 11:00 or 11:15 P.M. to get something to eat and that when he passed the Crisfield Street side of Nathan's he smelled the ordor of gasoline coming from the porch floor. He also stated that he had told this to the prosecutor. He then supported the defendants' alibi by testifying that on the night of May 22, at about 10:00 P.M., he had seen both defendants at Napoletano's house. They had both been working on a roadster and he had helped Napoletano adjust its carburetors, remaining there for about 45 minutes to an hour. He supported the defendants' testimony as to how they had been dressed that night. Finally he testified that he had been subpoenaed by the prosecutor as a possible witness in the case.

On cross-examination, Raffaeli testified that on July 30,

1976 he had talked to the prosecutor with a Mr. Hatsmann, one of the District Attorney's investigators, present. He recalled having given the prosecutor information about the arrest of the defendants concerning an incident which had occurred at about 1:14 or so on the morning of May 23, 1975. He recalled having told the prosecutor that he had worked on the roadster at Napoletano's house on May 22, 1975 from 6:00 P.M. until 10:00 P.M. and that he left there in order to pick up his girl friend. He saw the defendants again that night at about 11:00 or 11:15 P.M. at the Tanglewood Shopping Center, near Nathan's. He also recalled having told the prosecutor that, when the police asked them to move on, he, the defendants and his girl friend all walked across the street to Nathan's at about 11:30 P.M. and went up on to the outside patio, where he smelled the odor of gasoline and saw a lot of gasoline near the windows.

Raffaeli then denied having told the prosecutor that at the time he saw and smelled the gasoline, both Napoletano and Michael B. were joking around and saying that wouldn't it be funny if Nathan's burned down. He did remember, however, telling the prosecutor that he had not noticed any wet spots of gasoline on either of the defendants and that he had gone on to Andy's Deli, where he drank several beers and stayed until between 1:00 and 1:15 A.M. He could not remember, however, saying that he did not want to get involved and so he had left Nathan's at about 12:15 A.M., while the defendants were still there. He also remembered telling the prosecutor that he had stayed at Andy's Deli until 1:00 to 1:15 A.M. and that neither of the defendants had arrived by the time he left there.

On redirect examination Raffaeli said that he had refused to sign any statement based upon what he had told the prosecutor and that he had told the prosecutor that he wanted to talk to his attorney. He also testified that on May 22 when he smelled the gasoline at Nathan's, the defendants were not with him and that it was very possible that the defendants had been with him when he was at Andy's Deli on May 22 and 23.

The defense rested at the close of Raffaeli's testimony; the People then called Police Detective Crawford as a rebuttal witness with respect to alibi witness Chiulli's testimony. The People also called District Attorney's Investigator Hatsmann in alleged rebuttal. He testified that he was present during the entire time that Raffaeli was interviewed by the prosecu-

tor on July 30, 1976 and that, in the course of the interview, Raffaeli stated that Napoletano and Michael B. were joking around, saying: "Wouldn't it be funny if Nathan's burned down?" Raffaeli had said that he left the defendants at Nathan's at about 12:15 A.M. and had gone to Andy's Delicatessen, where he consumed approximately three beers and left approximately between 1:00 and 1:15 A.M., and that neither defendant had been there up to the time that he left.

### THE ISSUES.

The decisive issues on this appeal are whether (1) the admission in evidence of the testimony of the two arresting officers as to the on-the-scene identification of the defendants by the sole eyewitness to the crime, which bolstered that identification (conceded by the People to have been error under the authority of *People v Trowbridge,* 305 NY 471), (2) the admission on the People's direct case of testimony that one of the defendants had previously made trouble and committed a crime at Nathan's and (3) the acceptance of Hatsmann's rebuttal testimony about a prior inconsistent statement by the defendants' witness, Raffaeli, denying that he had ever heard the defendants say: "Wouldn't it be funny if Nathan's burned down", are errors which require reversal. We hold that they are.

### THE LAW.

In the oft-cited case of *People v Trowbridge (supra,* pp 473-477), the court in reversing a judgment of conviction said:

"Appellant was convicted of robbery in the first degree. The verdict is entirely dependent upon the complainant's testimony that there was a robbery and his identification of defendant as the perpetrator of it. The complainant also testified to his identification of the prisoner at Albany police headquarters prior to the trial.

"The testimony which requires a reversal here was given by the detective, Conley. Except for minor differences, *it is the same as that already given by the complainant Margolius during his direct examination.* * * *

"Appellant urges that it was reversible error to receive detective Conley's testimony relating to the previous identification. The controversy as to its admissibility centers about section 393-b of the Code of Criminal Procedure: *'Testimony of*

*previous identification.* When identification of any person is in issue, a witness who has on a previous occasion identified such person may testify to such previous identification.' * * *

"The question then is whether section 393-b of the Code of Criminal Procedure, quoted *(supra)* at page 475, permits the use of detective Conley's testimony.

"It is of course well established that a statute in derogation of the common law must be strictly construed. (McKinney's Cons. Laws of N.Y., Book 1, Statutes [1942 ed.], §§ 301, 305.) The statute in question is clear and unambiguous at least insofar as the issue under consideration is concerned. It provides only that that person who made a previous identification may testify thereto. There is nothing in its language to indicate that any person, other than the identifier, is relieved from the prohibitions otherwise existing.

"Numerous repetitions by various witnesses of the fact that on a particular occasion an identification was made by a complainant or other person are just as capable of exaggerating, in the minds of lay persons, the probative value of properly received substantive proof of identity, are just as capable of endowing such proof with an undeserved aura of trustworthiness, and are just as apt to have attributed to them some probative effect despite their hearsay character, as is testimony by a witness that on numerous prior occasions he had made an identification similar to that made by him on the witness stand. That the Legislature has seen fit to permit the latter is no valid reason for our saying, in the absence of legislative mandate, that the former must also be allowed. We should read the exception to the common-law rule as the Legislature wrote it and not seek to rewrite it.

"*Nothing need be said here to emphasize the nature of a conviction based only upon identification testimony such as present here—especially where identity is based upon brief observation by a single witness and where there is no proof of the robbery except the testimony of the same single witness. We would be reluctant to say in such a case that any error which is apt improperly to enhance the weight of such testimony is a technical one which may be disregarded*" (emphasis supplied).

Except that the charge there was for robbery and here it is for attempted arson, *Trowbridge* presents almost an exact replica of the facts here.

Here, as there, there was only one identification witness for

the People. Here, as there the testimony of the sole eyewitness was bolstered by testimony from the police which repeated and emphasized the complainant's identification of the defendants—except that here there were two such bolstering witnesses, and not one as in *Trowbridge.* Here, as there, the defendant called witnesses who "testified to an alibi" *(People v Trowbridge, supra,* p 478), and, in addition, here both defendants testified and denied any complicity in the crime charged. There the Court of Appeals held (p 476) that the District Attorney made a "tacit admission" that the bolstering proof was improperly received; here the District Attorney expressly admits that fact, for, at page 29 of his brief, he states: "the People concede that there was improper bolstering of Bloom's identification through the testimony of Patrolman *[sic]* Rasulo and Leinen."

Under the circumstances there should be a new trial, for as the court emphasized in *People v Caserta* (19 NY2d 18, 21), a violation of the *Trowbridge* bolstering rule may not be overlooked except "where the evidence of identity is so strong that there is no serious issue upon the point". That, of course, is not the case here, where an alibi was testified to by disinterested witnesses, and where both defendants took the stand and denied that they had been present at Nathan's at the time in issue.

There are, in addition, two other persuasive reasons for requiring a new trial:

(1) The People, over the strenuous objection of the defendants and their motion for a mistrial, were permitted, during their direct examination of Cliff Bartholomew, a former assistant manager at Nathan's, to elicit the following testimony:

"Q. Now, through your duties, what were your duties at Nathan's?

"A. Well, to see everything go right, you know, keep law and order in the place, and things like that.

"Q. Did you at any time ever run into any problems with any of the people at Nathan's? "A. Yes, I did.

"MR. CARROZZA: Objection.

"THE COURT: Overruled.

"Q. Did you see anybody in the courtroom today in which you had any problems with at Nathan's?

"MR. CAROZZA: Objection.

"THE COURT: Overruled.

"A. Yes, I do.

"Q. Could you point to any person in the court, please, and identify him by what he is wearing today?

"A. That young chap there, I know him.

"Q. What does he have on?

"A. He is wearing a brown jacket.

"MR. FRASCELLA: May the record reflect that the witness has identified Michael B.

"THE COURT: The record will so indicate.

"Q. Could you tell us, Mr. Bartholomew, what trouble you had with Mr. B.

"A. *Well, with him, really, he used to come into the store, you know, and sometimes steal pizzas and things like that.*

"MR. CARROZZA: Objection. Move to the withdrawal of a jury and the declaration of a mistrial.

"THE COURT: Denied. I will sustain the objection and strike the answer and instruct the jury to disregard it. Proceed.

"Q. Approximately the second week in May, 1975, Mr. Bartholomew, did you have occasion to observe Mr. B. in Nathan's?

"A. Yes.

"Q. *And could you tell us what you observed?*

"A. *He stole a piece of pizza pie.*

"MR. CARROZZA: Same objection, same application I made earlier, Judge.

"THE COURT; Just give, without characterizing it, anything, just say what you observed.

"A. *I saw him steal a piece of pie and he ran outside, that's all.*

"Q. Did you observe him taking the pie"

"A. No, he didn't.

"Q. Did you chase him?

"A. No. Well, he ran outside so I couldn't go outside.

"Q. Did you ever have occasion to talk to Mr. B.?

"A. Not him but his friend. Not this one. There was another guy, not him. I didn't really have any dealings with this young man.

"Q. Did you ever give Mr. B. instructions not to come into Nathan's?

"MR. CARROZZA: Objection.

"THE COURT: Overruled.

"A. Well, at times, yes, I would talk to him and tell him, you know, to behave himself and don't come back here. Yes, I did.

"Q. So you told him not to come back?

"A. Yes." (Emphasis supplied.)

That Michael B. was a "problem" or that he "sometimes * * * [stole] pizzas and things like that" or that he was told by the witness "to behave himself" and "don't come back here" clearly constituted inadmissible testimony of other crimes and improper conduct having no bearing on the charge for which the defendants were being tried, and was adduced at a time when they had not put their character or credibility in issue (see *People v Harris,* 209 NY 70).

The attempt by the District Attorney to fit the testimony within the *Molineux* exception (see *People v Molineux,* 168 NY 264) on the theory that it was admissible as motive testimony just does not hold water. The case of *People v Fitzgerald* (156 NY 253, 258-259), which he cites as justification for its receipt, is really authority to the contrary, for there the court said: "The motive attributed to the accused in any case must have some legal or logical relation to the criminal act according to known rules and principles of human conduct. If it has not such relation, or if it points in one direction as well as in the other, it cannot be considered a legitimate part of the proof."

To put it another way, evidence of the commission of another crime is admissible when it tends to prove a motive for the crime charged, but only if it has a logical relationship to the commission of the crime "according to known rules and principles of human conduct" *(People v Fitzgerald, supra,* p 259) but "there can be no question that the proof here relied upon by the prosecution to supply evidence of motive bears no logical relationship to commission of the criminal act with which the defendant was charged" (see *People v Namer,* 309 NY 458, 462; see, also, in this connection, Richardson, Evidence [Prince, 10th ed], § 171).

(2) On the cross-examination of defendants' alibi witness Raffaeli, he was asked whether he had told the prosecutor that the defendants had said to him: "Wouldn't it be funny if Nathan's burned down." He denied having made such a statement to him. As noted, the People thereupon called Mr.

Hatsmann, an investigator from the District Attorney's office, in rebuttal, to testify that Raffaeli had indeed uttered such a statement. The devastating effect of such testimony is apparent. If it was inadmissible it cries out for a reversal. In my opinion, it was improperly received since Raffaeli's negative answer was binding upon the People (cf. *People v Sorge,* 301 NY 198; *People v Duncan,* 13 NY2d 37; *People v McCormick,* 303 NY 403; *People v Schwartzman,* 24 NY2d 241, 245). At best, the investigator's testimony tended to establish that Raffaeli had made such a statement to him and not that the defendants, or either of them had indeed made the statement.

There should be a reversal and a new trial.

MARGETT, J. P., TITONE and SUOZZI, JJ., concur.

Judgments of the Supreme Court, Westchester County, rendered October 27, 1976 (as to defendant Napoletano) and November 5, 1976, on resentence (as to defendant Michael B.), reversed, on the law, and a new trial ordered. No fact issues were presented for review.