OPINION OF THE COURT
Bernard Fuchs, J.
Defendant has been convicted by a jury of criminal possession of a controlled substance in the second and third degrees. He moves, under CPL 330.30, to set aside the verdict on the ground that the trial was unfair due to prosecutorial misconduct.
The evidence at trial revealed that at 11:30 p.m. on November 12,1983 police responded to a call for help on Ocean Parkway at Ditmas. There they encountered defendant clad in damp pajamas. He said, “Help me”, and then threw a bag toward the police which they picked up. Defendant was agitated and incoherent but indicated that someone was after him or out to get him and trying to kill him. In response to questions defendant revealed his address, 465 Ocean Parkway, second floor.
After examining the bag defendant had thrown down, the police arrested him and then went to 465 Ocean Parkway. *453 There, they found defendant’s apartment door standing open and heard a shower running inside. Entering to investigate, they found no one in the shower or the apartment. There was no furniture. In the bedroom they found a blanket on the floor, a few pillows, an open, half-full wine bottle, three plastic bags of white powder, a jar with white powder, a plastic bag of bags, a scale, strainer, grinder and funnel. Some jewelry and currency rested on the television which was playing.
At the precinct an ambulance was called. Katherine Brogan, an Emergency Medical Service technician who responded, examined defendant and concluded that he had overdosed on drugs. An expert witness for the People testified that most of the cocaine recovered from defendant’s apartment was above the maximum level of purity usable for consumption. Some of the cocaine was as much as 85% pure; other parts 44.4% pure. A high level for street use would be 35% to 40%. Consumption of 85% pure cocaine could “blow the top of someone’s head off.” The value of the cocaine found in defendant’s apartment was $8,500.
English is a second language to defendant, an Israeli. Part of his evidence was taken through an interpreter. Defendant testified that on November 12,1983 he lived at 465 Ocean Parkway. Before that date he had used cocaine twice at parties but had never bought, sold or owned any.
November 12 was a Saturday. Defendant testified that he had planned to go to a disco in Sheepshead Bay with friends and wanted to buy a little cocaine for the first time. Having heard that it was available at the “El Greco”, defendant testified, he went there and met two men, “Jay” and “Kelvin”.
The two men allegedly told defendant they had no cocaine but could get it. Defendant’s evidence was that he gave them his address and they got to defendant’s apartment 20 to 30 minutes later. Defendant was then at home in pajamas preparing for a shower. He had lived there, he said, less than 1% months after moving from 20th Avenue and 51st Street and had no money for furniture.
Defendant testified further that Jay and Kelvin carried a gym bag which they opened in his bedroom while he went to get them a bottle of wine. From the gym bag Jay and Kelvin allegedly removed all of the contraband in evidence, both drugs and paraphernalia. When defendant returned with the wine they poured powder in lines on a piece of glass, rolled a dollar bill into a cylinder usable as a straw and told defendant to try it. Defendant snorted the powder.
*454 A few seconds later, defendant testified, he felt hammers in his head and started to shout for help, demanding, “What you gave me? * * * Help — It make me sick.” Appearing shocked and confused, defendant claims, Jay and Kelvin started to wrap up their goods. But defendant, who is 6 feet, 3 inches tall and heavy set, fought with them. They then, allegedly, grabbed the gym bag and ran out.
Defendant testified that he thought he was poisoned and that he went into the shower (still wearing pajamas) hoping to cool off, but without success. Feeling the hammers still in his head defendant picked up a plastic bag allegedly to take to a hospital and find out what had poisoned him. He went to the street and tried to find a motorist who would drive him. He then saw police officers walk tpwards him, threw the bag toward them and claims to have said, “Help me, take me to the hospital, they’re trying to poison me.” The next day, after defendant, as he testified, had asked all night to go there, police took him to a hospital.
Cross-examination elicited from defendant that he was employed at Junction Stereo and Camera on Junction Boulevard, Queens. He then testified to the length of time he had worked here, affirmed that he was working there in November 1983 and when he moved into the Ocean Parkway apartment. After four more questions on whether defendant worked there, defendant, in apparent frustration at this seeming failure to communicate, said, “You want my business card?” The prosecutor responded, “I don’t want your business card, I think we are getting the business alright”. Objection to this remark was sustained and the court reprimanded the prosecutor.
On further cross-examination defendant was asked whether in November 1983 he had also had an apartment at 5203 20th Avenue. He answered, “I didn’t live there no more.” This line of questioning nevertheless persisted to occupy 11 pages of the trial transcript. In the course of many denials that defendant had lived at 5203 20th Avenue in November 1983, the prosecutor elicited that defendant had moved a few weeks before the incident in question, that his previous landlord was Joel Gamil and the rent he had paid to Mr. Gamil.
Asked whether he had not, in fact, paid Mr. Gamil rent for October and December 1983 and January, February and March 1984, defendant responded that he didn’t understand. After a Hebrew translation, he denied it. The prosecutor then insistently repeated leading questions on whether he had paid Gamil for November 1983. Defendant again did not understand and at *455 one point said, “You mean after I left?” When the question was clarified he again denied the payment.
The prosecutor then had a document marked exhibit No. 4 for identification and asked whether defendant had paid Gamil rent for December 1983. Defendant denied this and similar additional questions about January, February and March 1984. The prosecutor then asked that defendant be shown “this letter” (exhibit No. 4). There was an objection to further questions along the same line. After a Bench conference, the objection was overruled and defendant was asked whether exhibit No. 4 changed any of his answers as to whether he had paid rent for the months September 1983 through March 1984 at 20th Avenue. He replied that it did not.
Exhibit No. 4 was a sworn statement of Joel Gamil dated October 2,1984 that defendant had resided and paid rent at the 20th Avenue address for six months from about September 1983 to April 1984. During the Bench conference, after defendant objected to further questions about defendant’s residence at 20th Avenue, the court examined the statement and then informed defendant’s counsel that the objection would be overruled because exhibit No. 4 furnished a good-faith basis for the interrogation.
Part of defendant’s testimony was that the police had taken him to the hospital the day after his arrest. Defendant did not know which hospital and could not recall being examined by Emergency Medical Service technician Brogan. She, however, testified that defendant had refused hospitalization. This point was covered in cross-examination and was argued in the People’s summation to attack defendant’s credibility.
In support of his motion defendant submitted affidavits of Joel Gamil and Abbot Bier who succeeded defendant as tenant of his 5203 20th Avenue apartment. He also submitted a copy of his emergency record at Woodhull Medical and Mental Health Center showing that he was brought there “by #14600,” on November 13, 1983, registered at 12:15 p.m. and discharged “to police” at 12:45 p.m. the same day.
Although defendant had told his attorney of the hospital visit well before trial, inquiry of the Emergency Medical Service yielded only a report of that agency. Having informed the People of the hospital visit defendant was then unable to supply a hospital record. Only a posttrial investigation by a private detective revealed that the police, not Emergency Medical Service, had taken defendant to Woodhull and that the usual *456 practice of signing a prisoner out and back into the precinct on such an occasion had not been followed. The People do not dispute this.
Abbot Bier’s affidavit is that he was a tenant at 5203 20th Avenue from November 1, 1983 through August 1984, did not know the defendant and had never seen him. The Gamil affidavit is that Mr. Bier occupied the same apartment defendant had vacated and, contrary to exhibit No. 4, that defendant was not a tenant in 5203 20th Avenue after October 31, 1983. Mr. Gamil states there that he had earlier “received a paper from the District Attorney’s Office * * * and thereafter * * * spoke to people from that office.” The District Attorney’s representatives allegedly suggested in an intimidating manner that defendant’s tenancy continued after October 31, 1983 and that if Gamil would so state in writing he “would not have to come to court.” Mr. Gamil “signed that piece of paper in order to avoid further intimidation and * * * avoid coming to court.”
On February 27, 1985 a hearing was held before me on the issues raised by Joel Gamil’s affidavit. Mr. Gamil was the only witness. My findings follow.
In 1983 and 1984 Joel Gamil owned 5203 20th Avenue. In Septémber or October 1984, he received a notice to appear at the District Attorney’s office. When he telephoned that office and objected to making the appearance, he was told that “they” would come to see him. On the telephone Mr. Gamil was asked whether he knew when defendant had vacated the apartment. He could not recall.
The next day two detectives (apparently the District Attorney’s detective-investigators) appeared at Mr. Gamil’s residence. One of them suggested that defendant had left in March 1984, but Mr. Gamil persisted in denying any recollection. The building in question houses only seven tenants but Mr. Gamil has 50 tenants in other properties and manages the buildings of other landlords.
One detective told Mr. Gamil to write a statement that defendant had left “as you say” in March 1984, and then Mr. Gamil would not have to come to court. He complied by writing the document which became exhibit No. 4 for identification at the trial. The receipt to Abbot Bier for the November 1983 rent (and several subsequent months) was received in evidence and I find that those payments were made.
In September and October 1984, Mr. Gamil did not have the receipt in his possession and Abbot Bier, who worked nights, was difficult to reach. Mr. Gamil, in composing the statement *457 which became exhibit No. 4, adopted facts suggested by the detectives and disregarded his own failure to recall. His will was overborne by the intimidating authority and pressure of the detectives to support their theory of the case and was undermined by his own desire to escape a court appearance.
Defendant was convicted under the first two counts of the indictment which covered, respectively, the cocaine found in defendant’s apartment and the bag found on his person. The jury was charged that in deciding whether defendant constructively possessed the cocaine in his apartment they could consider evidence that it was left there by others without an acceptance of possession by defendant or his exercise of dominion and control over it. The jury was also instructed, on the defense of temporary possession for lawful purpose under count No. 2, to consider evidence that defendant had carried cocaine out of his apartment solely to assist a physician or other expert to determine what had poisoned him.
The objective facts were undisputed or admitted. Defendant’s testimony was fully consistent with that of the police officers. It was also the only exculpatory state-of-mind evidence. His credibility was therefore crucial to the defense.
During defendant’s cross-examination, exhibit No. 4 played a prominent role. The prosecutor held it in his hand much of the time. It was the obvious subject of a Bench conference after which defendant’s objection to the questions based on it was overruled and they continued. And when exhibit No. 4 was handed to defendant, he was invited to retract his denials that he had paid rent after October 1983 for 5203 20th Avenue.
Although exhibit No. 4 was not received in evidence, the jury’s inference was inescapable that it contradicted defendant’s denials. That contradiction was false and was elicited by overzealous, overbearing prosecutorial action. It formed the sole basis for an extended attack on defendant’s credibility which would not have been permitted without it. Defendant’s only hope of acquittal (to raise a reasonable doubt about his state of mind) was therefore severely prejudiced by prosecutorial misconduct.
Exhibit No. 4 became, in effect, an unsworn witness which falsely contradicted defendant’s testimony and denied him a fair trial on the critical issue of his state of mind. And if that were not enough, defendant’s credibility was battered still further by two other abuses. His testimony about going to the hospital became vulnerable to the prosecutor’s attack because it could not be corroborated — a defense weakness traceable directly to *458 failure of the police (and therefore the prosecutor, People v Spruill, 47 NY2d 869 [1979]) to record defendant’s movements. The People knew before trial of defendant’s contention that he had been to the hospital. If the precinct records had been in order, the People’s own investigation would have uncovered the hospital record and precluded the impeaching questions to defendant on that subject.
The other abuse was the prosecutor’s remark, “I think we are getting the business alright”. The court sustained defendant’s objection and reprimanded the prosecutor but this unsworn testimonial attack, again on defendant’s credibility (and magnified by the prestige of the District Attorney’s office) could not be fully neutralized (see, People v Tassiello, 300 NY 425 [1950]; People v Billingsley, 74 AD2d 645, 646 [2d Dept 1980] [reversal of conviction based partly on “prosecuting attorney’s reference to the defendant’s testimony as a ‘con job’ and to the defendant as a ‘liar’”]).
In People v Duncan (13 NY2d 37 [1963]) defendant, convicted of forgery and larceny, testified that he had obtained a loan by signing his roommate’s name but that the roommate had authorized it. On cross-examination he denied having been convicted in military service of violating “Article of War 93”. The prosecutor continued on the same subject and then asked defendant whether he persisted in his denials even though “the fingerprint records indicate” that he had been convicted.
Reversing defendant’s conviction the court said (13 NY2d, at p 42) “the district attorney’s reference to such extrinsic evidence as fingerprint records * * * that the defendant had been convicted * * * ‘rendered [his] denials futile’ and stamped him as a liar.” In the present case the evidence which contradicted defendant and “stamped him as a liar” was not expressly described to the jury (as in Duncan) but its significance was nevertheless fully communicated to them (see, People v McCormick, 303 NY 403 [1952]). As in Duncan and McCormick, this amounted to an “ ‘assumption of facts not in evidence’ ” (People v Duncan, 13 NY2d, at p 41) which the People would not have been allowed to prove except from defendant’s answers (see, People v Sorge, 301 NY 198, 201 [1950]; People v Winston, 52 AD2d 432 [1st Dept 1976]).
Under Duncan (supra), the mere improper use on a collateral issue of extrinsic facts not in evidence is in itself fatal to the verdict when it contradicts the testimony of a defendant whose credibility is crucial to the defense. The impropriety in the present case is yet more aggravated because the extrinsic facts were also false and developed through prosecutorial misconduct.
*459 When the detective-investigators spoke to Joel Gamil it was apparent that he did not recall the dates of defendant’s tenancy or was, at least, very uncertain. Those dates were readily verifiable by further inquiry. The District Attorney’s duty is to uncover the truth not to build a case conforming to some preconceived theory. In determining the delicate question whether defendant’s trial was fair enough to sustain the verdict, the District Attorney must be considered to have known what reasonable inquiry would have revealed.
The use of a false exhibit which had the full impact of evidence and the prosecutor’s failure to disclose its falsity compels the conclusion that the trial was unfair (People v Robertson, 12 NY2d 355, 359-360 [1963] [defendant’s testimony that confession critical to conviction was given when he was “plied with wine” rebutted by detective’s testimony that he had been present for all questioning and there was no wine. New trial required upon detective’s posttrial recollection and admission that he had been absent during part of the questioning. “[T]he untrue story was given by the very police officer in charge of the investigation and his wrongdoing must be charged to the prosecution * * * [T]he giving of carelessly false testimony is * * * as much of a ‘fraud’ on the court as if it were deliberate”]). And the use of false evidence or (as in this case) its equivalent is a denial of due process of law (Napue v Illinois, 360 US 264 [1959] [false testimony that witness received no promise of consideration for testifying known to prosecutor but not disclosed; due process violated]; People v Geaslen, 54 NY2d 510 [1981] [nondisclosure to suppression hearing court of Grand Jury testimony conflicting with evidence of lawful search denied defendant due process; denial of suppression vacated and new hearing ordered]; see also, People v Pelchat, 62 NY2d 97 [1984] [mistaken identification of defendant before Grand Jury not disclosed by prosecutor before plea of guilty; indictment dismissed]; see, People v Cwikla, 46 NY2d 434 [1979]).
The Assistant District Attorney’s unawareness that exhibit No. 4 was false and that it em anated from a default of prosecutorial duty in no way excuses its use (People v Robertson, supra). Defendant was nonetheless denied due process of law (Barbee v Warden, 331 F2d 842, 846 [4th Cir 1964] [failure to disclose exculpatory evidence known to police but not prosecutor violates due process]). Nor is due process less implicated because the false evidence bore on the issue of credibility rather than that of guilt (Napue v Illinois, supra) or less unfair because the prosecutor’s conduct was not prompted by guile or an intent to prejudice *460 defendant (People v Savvides, 1 NY2d 554 [1956]; People v Cwikla, supra).
Defendant’s motion to set aside the verdict and for a new trial is granted.
(Upon reargument, May 28, 1985)
The People move for reargument of defendant’s motion to set aside the verdict. They ask the court also to reopen the posttrial hearing held to determine fact issues raised by that motion and, in support of their request, submit Detective Investigator Wayne Tennant’s affidavit as an offer of what they would prove.
This court found from the hearing evidence that exhibit No. 4 at trial, Joel Gamil’s affidavit, was false and that Gamil had “adopted facts suggested by the detectives and disregarded his own failure to recall. His will was overborne by the intimidating authority and pressure of the detectives * * * and was undermined by his own desire to escape a court appearance”.
There was never any doubt about the purpose of the hearing. The People knew full well that Joel Gamil would testify. And from his affidavit and that of Abbot Bier, in support of defendant’s motion, they had good reason to know what Mr. Gamil’s testimony would be. The court, moreover, expressly invited both sides to develop fully at the hearing any issue raised by defendant’s motion.
All this notwithstanding, the People now ask the court to receive the testimony of Detective Tennant who obtained the Gamil affidavit. He did not previously testify due to what they call “excusable neglect”. Almost in the same breath, however, the People concede that their failure to call Detective Tennant at the hearing was (far from being a neglect) “what in hindsight appears to be an incorrect strategic decision”.
The People’s omission to present Detective Tennant’s testimony was neither excusable nor justifiable. The hearing did not proceed, for example, on any theory that would render his testimony irrelevant. Neither was there any ruling of this court from which the prosecutor could conclude that the detective’s testimony was precluded (see, e.g., People v Payton, 51 NY2d 169 [1980]).
There is no suggestion, moreover, that the People did not have a full opportunity to present evidence and for that reason “ ‘[t]here [is] no justification * * * to afford the People a second chance to succeed when once they had tried and failed’ ” (People v Havelka, 45 NY2d 636, 643 [1978]). To grant the People an additional hearing on an issue which they have had the fullest *461 opportunity to litigate would constitute a clear abuse of this court’s discretion. Ours is “a system that offers a single opportunity for the presentation and resolution of factual questions” (People v Havelka, supra, p 643).
Even if a proper exercise of discretion could permit a second or extended hearing it would not be warranted. The People assume that the decision would have been different without a finding of misconduct by the detectives in obtaining exhibit No. 4, Gamil’s false affidavit. That assumption is incorrect as the court’s reliance on People v Duncan (13 NY2d 37 [1963]) makes clear.
There is, in any event, no doubt about this court’s finding of prosecutorial misconduct even giving full credence to Detective Tennant’s affidavit. He informs the court that when he spoke to Mr. Gamil by telephone about the dates of defendant’s tenancy Gamil answered “to the best of his recollection”. The same paragraph concludes, “Gamil added that he would look for his records * * * to determine exactly when Attiya resided” there.
When the detective visited Gamil “within days” of the foregoing telephone conversation “Gamil * * * stated that he was still searching for the rental records of Attiya”. At paragraph 9 we learn that “Gamil asked ‘what should I write?’ I responded ‘put down the dates you said over the phone’. He then stated, ‘March or April is what I recall’ and I said, ‘then write it down, write down what you remember’ ”.
The candor of this affidavit is commendable. The approach it reveals to the development of evidence for criminal prosecution is not. It is, in fact, substantially consistent with Gamil’s testimony, omitting mainly the subjective impact made on him by the detective’s authority and style.
The fact which leaps out from Detective Tennant’s affidavit is that Gamil was uncertain of the information he was giving; that he would have preferred to examine his records but had not done so. Nevertheless, Mr. Gamil placed himself submissively in the detectives’ hands saying, “What should I write?”, abdicating (as his testimony indicated he had) his own autonomy in making the statement. And Detective Tennant unabashedly told him what to write. Both witness and investigator were thus equally indifferent to the truth of the statement they propounded for use in a criminal prosecution.
Defendant was tried all the way to conviction while no prosecutorial operative lifted a finger to perform an easy verification of facts questioned by their own proponent. Those facts (now *462 proven to be false) became instrumental in convicting defendant. The conduct of this investigation was misconduct indeed.
Motion denied.