OPINION OF THE COURT
Wachtler, J.
A jury convicted the defendant of unlawful possession of a weapon (Penal Law, § 265.05, subd 2), a felony, and unlawful possession of a weapon (Penal Law, § 265.05, subd 3), a misdemeanor. At a pretrial hearing, defendant’s motion to suppress was denied. The Appellate Division found the evidence offered at the suppression hearing insufficient to justify the challenged police action, and, holding the appeal in abeyance, remitted the case for a rehearing, giving the People the opportunity to offer further evidence. After the rehearing the lower court adhered to its initial determination, and the Appellate Division affirmed both the order denying the motion and the judgment of conviction. The primary issue is whether it was proper for the court to remit the case for a second hearing.
Patrolman Michael Bassano of the Port Chester Police Department, the only witness called for the People at the first suppression hearing, testified that while on duty at 11:30 p.m. on January 23, 1973 he rang police headquarters from a call box, and spoke to the Desk Sergeant, Roger Arlotta. The sergeant informed him that he had received a telephone call from the Depot Tavern warning of a possible gun battle in the vicinity of the tavern involving the Tribe Motorcycle Club. Bassano was ordered to meet a Lieutenant Sabia at the railroad parking lot across the street from the Tribe clubhouse, which was located two doors away from the Depot Tavern. Upon his arrival, Bassano was ordered to take a position with two fellow officers on the roof of the Port Chester Auto Driving School, adjacent to the parking lot. Other officers were stationed in nearby patrol cars.
After 10 or 15 minutes of observation from the rooftop, Bassano saw two or three automobiles and two motorcycles, carrying a total of about seven males, arrive at the scene. These 7 men were met by approximately 10 others who exited the clubhouse. The entire group then began walking toward *640 the Depot Tavern. Although no suspicious activity was observed, nor any weapons seen, Lieutenant Sabia ordered his men to "get down there”. Bassano descended to street level and proceeded to frisk two or three of the "suspects”, who offered no resistance. No weapons were discovered. Bassano then frisked defendant and felt a hard object under his jacket, a .38 calibre revolver. Bassano seized the weapon which, although registered in Connecticut was unregistered in New York. Immediately he handcuffed defendant to a parking meter and conducted a full-blown search which revealed a blackjack hidden in defendant’s boot. Bassano removed the boot and seized the blackjack.
At trial, Richard Garafola, a Tribe member, testified that several police officers were "lined down the street in the middle of the road with sawed off shotguns” while others frisked and searched club members, and that an in-depth search of the clubhouse was conducted. Defendant, who took the stand at trial, testified that the police made no inquiries prior to conducting the searches, and Sergeant Arlotta testified that besides defendant only one other person searched was found to be in possession of a weapon, a blackjack.
After defendant’s convictions of the weapons charges the Appellate Division (50 AD2d 904, 905) ordered that "[a] new hearing should be held to afford the People the opportunity to produce Hechinger [the owner of the Depot Tavern who had informed Sergeant Arlotta of the possible gun battle involving the Tribe] and any other proof they may have to establish probable cause.”
At the new hearing Hechinger testified that he had called the Port Chester Police Department from his home in Cos Cob, Connecticut, and that in his telephone conversation with Sergeant Arlotta he had merely relayed information which he had received a few minutes before from his bartender Danny Megan,[1] who was working at the Depot Tavern that evening. Megan had warned Hechinger that certain Tribe members were causing a disturbance at the tavern, and that he had heard a rumor that there might be a shootout. It is unclear from Hechinger’s testimony whether Megan had seen any Tribe members carrying weapons.
Preliminarily we note that the Appellate Division was *641 correct in its initial determination that the People failed to justify the challenged search at the first suppression hearing. The People argue that the search of defendant was reasonable in light of the police communication received by Bassano because, although hearsay, the knowledge transmitted in a police radio communication is imputed to the receiver who is charged with that knowledge. But on a motion to suppress, the challenged police conduct can be sustained only by proof that the sender actually possessed the requisite knowledge or that the personal observations of the receiving officer justified the search (People v De Bour, 40 NY2d 210, 223-224; People v Lypka, 36 NY2d 210, 214; cf. People v Horowitz, 21 NY2d 55, 60).[2] Assuming in this case that the police communication prima facie supported the police action taken, it was nevertheless incumbent on the People to produce the sending officer Sergeant Arlotta at the suppression hearing. Yet, although both he and Hechinger, the informant, were apparently available to testify at the hearing, neither was called. The danger in relying solely on Bassano’s hearsay testimony to sustain the legality of the search is underscored by the fact that his information was tenuously balanced on a pyramid of hearsay, the information having been passed from Megan to Hechinger to Arlotta to Bassano. It seems, too, that Megan’s source may well have been nothing more than unsubstantiated rumor.
Nor did Bassano’s personal observations justify the search. The mere fact that he saw a group of Tribe members congregate outside their own clubhouse, and that they were dressed in a manner typical of motorcyclists, "in dungarees with, for the most part, black leather jackets or dungaree jackets” (dissent p 649) hardly establishes grounds sufficient to support the challenged police action. Indeed the utter lack of suspicious activity observed during the period of surveillance attenuates whatever justification the police communication might have furnished to conduct the search.
Having concluded that the Appellate Division was correct that the testimony at the initial suppression hearing was insufficient to justify the search, we must resolve the primary *642 issue — whether the remission for a rehearing was proper. We hold that it was not.
It is the nature of our common-law system that a single precedent will rarely fully reveal its underlying principles. We can expect little more than a glimpse into a direction in which the law is moving. "Cases do not unfold their principles for the asking. They yield up their kernel slowly and painfully” (Cardozo, Nature of the Judicial Process, p 29). Rules emerge and aré tested against varying factual backgrounds. Those rules which accomplish just and workable results survive and expand. But a principle should never be applied hastily without measuring its probable effect. It is the purpose of the rule, rather than the rule itself, to which we are ultimately bound.
The courts must take particular care that precedents creating procedures do not sweep too broadly. It is all too easy to adhere blindly to a procedure, forgetting its purpose. We decide the issue of whether or not there should have been a remission for additional proof within this framework.
The practice of granting a rehearing to afford the People the opportunity to present additional evidence was first established in People v Malinsky (15 NY2d 86). In Malinsky at the suppression hearing, conducted solely to determine if the search and seizure was incident to a lawful arrest, the court erroneously denied defendant’s motion for disclosure of a confidential informant, and ultimately denied the motion to suppress. On appeal we found the record insufficient to substantiate that either the informant was reliable or that probable cause existed independent of his communication. Although we did not articulate the reasons for ordering a further hearing, it is manifest that the People had failed to present the testimony of the informant because of the court’s erroneous ruling. To deny the People a rehearing to present his testimony would have been to deprive them of a full opportunity to be heard. In addition other relevant testimony was also admissible at the rehearing since the People, misled by the ruling, might have declined to offer available testimony believing that sufficient evidence had already been presented (see, also, People v Verrecchio, 23 NY2d 489).
The procedure established in Malinsky has found application in numerous subsequent cases (see, e.g., People v Hill, 22 NY2d 686; People v Butterly, 25 NY2d 159; People v McDonnell, 18 NY2d 509). These decisions, however, do not reflect an abdication of reason or the slavish application of an *643 entrenched procedure, for they are consistent with the emerging principle implicit in Malinsky — that the People should not be deprived of one full opportunity to present evidence of the dispositive issues involved at the suppression hearing. If an error of law is committed by the hearing court which directly causes the People to fail to offer potentially critical evidence a rehearing should be ordered so that the evidence may be presented. Thus where a motion to suppress was denied on the erroneous ground that the search was supported by search warrants, the case was properly remitted for a new hearing for a finding as to whether probable cause, independent of the warrants, justified the arrest and incidental search (People v Green, 33 NY2d 496). Similarly, an error of law made at the suppression hearing that consent to the search was not at issue required remission for a rehearing for proof on that question (People v Whitehurst, 25 NY2d 389). To hold otherwise would be to deny the People the opportunity for a full and fair hearing.
But having established this procedure for a sound reason, it would be wrong to assume that the People’s right to a rehearing is without limitation. The practice should not be followed when its underlying principle is not served. Generally, where "no contention is made that the People had not had [a] full opportunity to present evidence * * * [tjhere [is] no justification * * * to afford the People a second chance to succeed where once they had tried and failed” (People v Bryant, 37 NY2d 208, 211; but see People v Cardaio, 18 NY2d 924). Denial of a rehearing under these circumstances accords with a system that offers a single opportunity for the presentation and resolution of factual questions. If such a practice were not followed, the defendant, having prevailed at the hearing, would be haunted by the specter of renewed proceedings. Success at a suppression hearing would be nearly meaningless, for a second and perhaps a third hearing, could later be ordered.
It is of equally great concern that a perfunctory remand would magnify the potential for abuse and injustice. "A remand with the benefit of hindsight derived from an appellate court opinion offers too facile a means for establishing probable cause after the event” (People v Hendricks, 25 NY2d 129, 138). Tailoring the evidence at the rehearing to fit the court’s established requirements, whether done unconsciously or otherwise, would surely be a considerable danger. A procedure *644 which fails to shield a criminal defendant from abuses so inimical to the rights guaranteed him should not be tolerated.
Under certain circumstances, however, the risk of the introduction of distorted testimony at a rehearing is minimal. Thus a rehearing was ordered where information supporting a search was furnished by an interstate bulletin (People v Lypka, 36 NY2d 210, supra) or by a communication from one division of a police department to another (People v Horowitz, 21 NY2d 55, supra). In such cases the lack of familiarity and personal contact between the sending and receiving officers diminished the potential for distortion.
Today, we confront quite a different case, the sending and receiving officers being members of the same police department, and working closely with one another on a daily basis. The rationale of Lypka and Horowitz, which supported a remand for a new hearing, is therefore inapplicable. Nor were the People deprived of a full opportunity to present evidence at the initial hearing. No erroneous ruling interfered in any way with the People’s opportunity to advance evidence to justify the challenged police activity. Although both Arlotta and Hechinger were available to testify at the initial hearing, the People were content to offer only the testimony of Patrolman Bassano which was legally insufficient to uphold the search. Having had a full opportunity to be heard, the People should not be heard again on the same issue.
Accordingly the order of the Appellate Division should be reversed and the indictment dismissed.

. Although summoned to testify at the rehearing, Megan failed to appear.

. The correctness and applicability of this rule is not impugned by People v Mack (26 NY2d 311, 315), as the dissent would have us believe. In Mack the testimony of the officer furnishing the information was not required at the suppression hearing, since the arresting officer, before taking any action, observed "furtive conduct” on the part of the defendant. By contrast Bassano saw nothing which could fairly be characterized as furtive conduct or suspicious activity.