■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOMINICK J. GRIMALDI, Appellant.—Appeal from a judgment of the County Court of Greene County, rendered November 21, 1978, upon a verdict convicting defendant of the crime of murder in the second degree. The dismembered body of John Pisacano was discovered in the back of a truck at the residence of Albert Petgen on December 14, 1977. Convicted of Pisacano's murder, defendant raises a number of issues on this appeal which necessitate a recitation of the pertinent facts. At about 4:30 A.M. that morning, Sergeant Joseph Syvertsen, a 16-year veteran of the New York State Police, was on duty at the State Police substation in Leeds, Greene County, New York. A call was received from Ben Petgen reporting a burglary in which he had shot one of the perpetrators, later identified as John Marmo. Syvertsen called back and spoke to Ben Petgen who, in a highly emotional state, reiterated this information, mentioned that he had fired a shotgun at a burglar breaking into his father's house, added that there was a second person involved and warned that he would shoot again if anyone came back. Syvertsen advised Petgen that police were on the way to the residence, which was in a rather remote area of the county, and to be careful not to shoot a trooper. By radio he then directed Trooper Morris to respond to the scene and to contact him upon arrival so that he could alert Petgen. Another troop car out of Kingston, New York, monitored the conversation, called Syvertsen, and was also directed to the scene. His next communication was from Trooper Morris at the Petgen residence who told him, based on his observations and what Petgen had related, that there were two parties involved in the burglary. One had fled on foot and his footprints in the fresh snow led out to the road. No fresh tire marks were visible and the missing subject was a male wearing denim pants. It now being approximately 5:00 A.M., Syvertsen left the station to proceed to the Petgen residence on Ford Hill Road, a considerable distance from Leeds. There was an accumulation of six to eight inches of snow on the road and progress was slow. Before he could reach that destination, the Leeds station radioed him with further information. A named individual had called the station advising that he had just given a ride to a young, stocky male—possibly of Italian origin and wearing a blue ski jacket—from Ford Hill Road to Elm Ridge

Estates. It was now approximately 5:30 A.M. Syvertsen then changed his destination to Elm Ridge Estates, a small subdivision with but one road leading to it, and notified the Kingston vehicle to join him there. On arrival, he observed lights in the first house on his left and saw fresh footprints leading directly to it. He turned on his flashing lights, waited for the other troop car, and then knocked on the door. When it was opened by one Doherty, Syvertsen looked inside and saw a stocky male, possibly of Italian origin, wearing a blue ski jacket and denim pants. He told this individual to come out on the porch. He did and, upon request, identified himself as Dominick Grimaldi. Syvertsen then frisked him for weapons and discovered a large quantity of cash and noticed what he believed to be blood stains on the left side of his jacket. He was then handcuffed, given *Miranda* warnings by another trooper, and taken into custody. Further investigation of the burglary disclosed Pisacano's body, and a later seizure of defendant's clothing and other items found on his person yielded evidence linking him to the homicide. However, at this juncture, we must first resolve the troublesome question of whether there was sufficient probable cause for Syvertsen to arrest defendant. We conclude that his arrest was lawful and thus justified the subsequent incidental search of his person. In determining whether probable cause existed, we are concerned with probabilities, not technicalities, and a police officer need not reject what he sees and believes (cf. *People v Tolentino,* 40 AD2d 596). Here an experienced officer spoke directly with the complainant and learned that an attempted burglary had taken place. His subordinate relayed confirmation of the event and added that the missing subject had departed on foot. Inasmuch as the occurrence had taken place at an early morning hour in a remote area during a snowstorm, the unsolicited report of a named citizen stating he had given a ride to someone from that vicinity was of critical importance. When Sergeant Syvertsen observed footprints outside a lighted house at the Elm Ridge Estates shortly thereafter, and then came face to face with an individual matching the expanded description he had received, he possessed far more than suspicion. A reasonable and cautious police officer would act on the obvious factual and practical considerations of everyday life and form a genuine belief that the individual had committed a crime (cf. *People v Reisman,* 29 NY2d 278). The information he possessed did not rest entirely on the word of an anonymous tipster or on possible rumor (contrast *People v Havelka,* 45 NY2d 636, 641; *People v De Bour,* 40 NY2d 210, 222-223); it was based on his observations and unchallenged reports which were transmitted to him. Taking into account the exigencies of the attending circumstances, defendant's warrantless arrest was valid. Meanwhile, following the identification of the remains of Pisacano and the other would-be burglar, Marmo, inquiries revealed that both had been associates of the defendant. At trial it was established that this triumvirate had recently arrived from the New York City area; had known each other previously; spent considerable time together; possessed large sums of money in the form of cash; were fond of guns and target shooting; and were also known to be users of drugs. On the evening of December 12, 1977, the three were present at the Petgen residence where there was a disagreement among them which culminated in threats suggesting violence with the use of knives. During the early morning hours of December 13, 1977, a number of shots were heard at a nearby apartment on Ford Hill Road. A tenant occupying the lower floor of that building, Edward Beck, recounted that he was awakened by what "sounded like a big gun and a little gun" and that Marmo, holding a gun, asked whether he had heard anything. Later that morning a check of the apart-

ment revealed some disarray, "red splatters" on the walls and stairs, and a missing shower curtain. Bloodstains found on Grimaldi's jacket and trousers matched Pisacano's blood type, and the victim's body was partially wrapped in a shower curtain when discovered. An autopsy revealed that Pisacano had been shot to death on December 12 or 13, 1977 and that his head, hands and feet were severed from his body sometime after death. Significantly, .22 and .357 calibre bullets were recovered from his torso. Other relevant evidence, including defendant's flight from the Petgen residence, was also introduced. In our view, although the evidence was primarily circumstantial, it was sufficient to establish defendant's guilt beyond a reasonable doubt (cf. *People v Rumble*, 45 NY2d 879). We reject the arguments advanced by defendant directed at the conduct of the trial, the summation of the prosecutor, and the charge of the court. We do, however, address his contention regarding the introduction of portions of a telephone conversation with his father. On December 15, 1979, two State Police officers visited defendant at the Greene County Jail. After stating an attorney had been appointed to represent him but that he did not then want one as he had dismissed the counsel so assigned, defendant indicated that the only person he wanted to speak to was his father. The officers proceeded to question him about the pending murder charge and alternatives to such an accusation. Defendant repeated his desire to converse with his father and one of the officers made arrangements with the jailer to have a telephone placed in his cell. The officer then overheard defendant's subsequent conversation and related it at trial. The jury may well have interpreted defendant's remarks as an admission of guilt and, if so, the matter undoubtedly contributed to his conviction. Nevertheless, the police questioning elicited no incriminating statements and, in effect, nothing more transpired than if the jailer himself had overheard those comments (cf. *Lanza v New York*, 370 US 139). Judgment affirmed. Greenblott, J. P., Sweeney, Kane, Staley, Jr., and Casey, JJ., concur.