*634 OPINION OF THE COURT
Joseph C. Calabrese, J.
This is a case of first impression.
Defendant is charged in indictment No. 91848 with robbery in the first degree (counts 1, 2, 3), robbery in the third degree (count 4) and attempted robbery in the third degree (counts 5, 6). Defendant is also charged in indictment No. 92561 with one count of robbery in the first degree.
Simply, it is alleged that in committing each of the crimes defendant would follow a female who detrained at the Great Neck Plaza Long Island Railroad Station to her apartment building and there rob or attempt to rob her. He would then tell the victim to go into the building, or if already inside, to go further into the building. Defendant would then flee.
Thereafter, defendant moved for various items of pretrial relief, including a Wade hearing to determine, in part, whether lineup identifications made by certain of the victims would be admissible at trial.
Upon the People’s application, a pretrial Wade hearing consolidating identification issues related to both indictments was held; after which the court made the following relevant findings of fact and concomitant conclusions of law in a memorandum decision dated February 27, 1996, to wit:
"On July 11, 1995 a court ordered line-up was conducted at the Nassau County Robbery Squad in Bellmore. Present at the line-up were numerous Police Officers, including Detective Hill-man who was in charge of the case, two defense attorneys who both testified at the Hearing, the Defendant and five line-up fillers. All participants were black males, approximately the same age, with facial hair, wearing baseball caps and covered by a sheet with numbers in front of each individual. Eight photographs of the line-up, show Defendant in position #2. The number placards allegedly used at the line-up were placed in evidence. Frydel identified Defendant in 4 seconds, Nabiloff in 15 seconds, Bergang took a little more time and then identified Defendant, and Gerardi recognized Defendant in 20 seconds. McDermott viewed the line-up for over 4 minutes and identified a filler in position number 1, not Defendant, as the person who had robbed her. Bacon did not attend the line-up.
"Photographs of the line-up indicate that placard number 2 placed in front of Defendant was orange while the placards in front of the other live participants were each a light yellow with the numbers 1, 3, 4, 5 and 6 respectively. Number 6 was *635 underlined to differentiate it from number 9. Placards number 1, 3, 4, 5 and 6 placed in evidence by the People were a dark orange and show a number 6 with no line under it. The number 2 placard was the same as in the photograph. The Court finds that the placards introduce [sic] into evidence [at the hearing] were not the placards used at the [line-up] with the exception of the placard number 2. * * *
"Lineups are the preferred identification procedure (People v Garcia, 115 AD2d 617). Here, the participants in the line-up were similar in appearance, Defendant chose the position he wanted to be in and all participants in the line-up were covered from their necks down with a sheet. The witnesses who identified Defendant did so quickly and there was no suggestiveness with respect to any impermissible conduct prior to the viewing by these witnesses. The orange placard placed in front of Defendant was different than the light yellow placards placed in front of the remaining five participants. It is noted that Mc-Dermott did not identify Defendant, but another individual at the line-up. Even though the various testifying victims indicated they identified the Defendant from his face alone, the Court cannot state with certainty whether this distinctive orange placard did or did not affect Defendant’s identification at the lineup. The use of these different colored placards was so highly suggestive that the Court is constrained to suppress testimony regarding the line-up at the time of trial.”
The hearing also included testimony as to the various victims having an independent source to identify the perpetrator at trial, after which the court concluded: "The various victims, with the exception of Bergang, testified as to their independent recollections vis-á-vis identifying Defendant. The Court finds that each of those testifying witnesses has a more than an ample independent recollection to make an in-court identification [of Defendant] untainted by any pretrial procedure (People v Washington, 111 AD2d 418; People v Jones, 112 AD2d 952).” Notwithstanding the court’s ordered suppression of lineup testimony and separate findings that the witnesses had an independent untainted basis upon which to make an in-court identification at the time of trial, the People move for a second court-ordered lineup to permit possible new identifications by three of the victims who had previously identified defendant at the now suppressed July 11, 1995 lineup.
Neither the People nor defendant cite any case in which such application has been either granted or denied. Nor has the court discovered any case within New York jurisprudence.
*636 However, in People v Crandall (69 NY2d 459), and People v Havelka (45 NY2d 636), the Court of Appeals enunciated the now well-established rule that at a suppression hearing the People are entitled to one full and fair opportunity to litigate disputed issues and present all available admissible evidence, creating an exception for a rehearing only where an error of law committed by the hearing court directly causes the People to fail to offer evidence critical to the eventual outcome of the hearing.
In Havelka (supra, at 643), the Court wrote: "But having established this procedure for a sound reason, it would be wrong to assume that the People’s right to a rehearing is without limitation. The practice should not be followed when its underlying principle is not served. Generally, where 'no contention is made that the People had not had [a] full opportunity to present evidence * * * [t]here [is] no justification * * * to afford the People a second chance to succeed where once they had tried and failed’. Denial of rehearing under these circumstances accords with a system that offers a single opportunity for the presentation and resolution of factual questions. If such a practice were not followed, the defendant, having prevailed at the hearing, would be haunted by the specter of renewed proceedings. Success at a suppression hearing would be nearly meaningless, for a second and perhaps third hearing, could later be ordered. ” (Emphasis added; citations omitted.)
In Crandall (supra, at 464-467) the Court opined: "Having articulated the view that the People should not be deprived of one full opportunity, the majority in Havelka concluded that the People should not, on the other hand, have a right to rehearing without limitation, and that there is no justification for providing a second chance to the People where they tried once and failed without the interposition of judicial error. * * *
"Correspondingly, as under the Havelka principle, when the evidence at trial is insufficient after the People have had a full opportunity to present their evidence, the appropriate corrective action is to dismiss the criminal charge. In short, the parallel between the corrective action of cases of true insufficiency of the evidence and those involving trial errors helps to demonstrate the correctness of the rationale * * *
"[W]e also reiterate the caveat expressed in Havelka * * * that suppression courts should be alert to the potential for abuses through the tailoring or alteration of testimony [at hearings] to satisfy the deficiencies found by an appellate court. From their unique fact-finding perspective, they should not *637 countenance law enforcement misconduct in this respect. The objective [is] * * * not to allow * * * unfair resuscitation of defective cases with the aid of * * * hindsight.”
The principles to be extracted from the foregoing and which, by analogy, should be applied to the instant application are as follows: (1) In retrospect, did the suppression court preclude the People from offering relevant evidence regarding the lineup which would inure to their benefit; (2) Did the People have a full and fair opportunity to litigate the suggestibility/ nonsuggestibility of the first court-ordered lineup; (3) Would the granting of the application for a second lineup result in the People’s circumventing the results of a prior inappropriate law enforcement procedure by having "a second chance to succeed where once they had tried and failed”? (People v Bryant, 37 NY2d 208, 211.)
With regards to (1) and (2), the People had a full opportunity to present any and all evidence that they so chose and to litigate the lineup issues; the court ruled on the People’s Chipp■ application (People v Chipp, 75 NY2d 327) and after denial of such the People had the full opportunity to litigate and have the court determine whether the now suppressed lineup tainted the witnesses’ ability to independently identify the perpetrator of the separate robberies.
Turning to (3), the court’s January 27, 1996 decision specifically noted that the placards in evidence (except for placard No. 2) were not the placards used at the lineup. Clearly, all testimony that such placards were the same was erroneous, if not tailored, to nullify defense claims that Allah was impermissibly highlighted at the first lineup. Granting a second lineup, at this stage of the proceedings, would clearly result in the People’s circumventing the effects of the ordered suppression of the tainted first lineup and give them an opportunity to re-litigate, in perpetuity, a second or even successive lineups.
The court has already determined that each of the victims who would view the second lineup had an independent basis to identify the perpetrator separate and apart from any taint, either objectively or subjectively, caused by the first lineup. For all intents and purposes, the People’s seeking to obtain lineup evidence amounts to no more than bolstering of at least three possible separate eyewitness identifications of defendant at the trial. The equities of this case demand that the People not be given a second chance to succeed in obtaining lineup evidence after such had been suppressed as a result of the law enforcement procedures employed at the first lineup.
*638 The People cite People v Lee (207 AD2d 953), People v Smith (154 AD2d 633), and People v Mullen (143 AD2d 849) for the proposition that where there is a significant time hiatus between a tainted identification procedure and a subsequent lineup, attenuation by time nullifies any possible taint. These cases are inapposite.
In Lee, Smith and Mullen (supra), each separate Court held that the use of prior unsuggestive photo arrays did not taint subsequent lineups and that even if the arrays were suggestive, an identification at a lineup months later was sufficiently attenuated in time to nullify any possible taint.
In the instant case, all photo arrays were likewise found, after the Wade hearing, to have been nonsuggestive. It was the subsequent lineup and not prior viewing of a photo array which was suggestive. Simply, the People should not be permitted to circumvent the results of a lineup they conducted. Defendant is entitled to a final meaningful resolution of these suppression issues and not be "haunted by the specter” of a new suppression hearing which could have effect of reversing the outcome of the first.
Accordingly, the People’s application for a second lineup order is, in all respects, denied.
The court notes that it does not determine the propriety of a request for a second lineup to be conducted prior to the commencement of a Wade hearing.
Defendant also moves to consolidate indictment No. 91848 and indictment No. 92561 for trial.
The motion is denied. Hearings are complete as to indictment No. 91848 and that case is scheduled for trial. On the other hand, a hearing must be completed as to indictment No. 92561 and consolidation would delay the scheduled trial. In any event, the court declines to utilize the discretionary consolidation provisions of CPL 200.20 (5).
Indictment No. 91848 shall proceed to trial on May 14, 1996.