[3 NE3d 1121, 980 NYS2d 873]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v KEVIN W., Respondent.

Argued October 10, 2013; decided November 21, 2013

**POINTS OF COUNSEL**

*Richard A. Brown, District Attorney,* Kew Gardens (*Danielle S. Fenn* and *John M. Castellano* of counsel), for appellant. I. The Appellate Division erred in holding that the suppression court was without power to reconsider its adoption of a judicial hearing officer's recommendation or order the taking of additional evidence. In any event, the evidence at the initial hearing warranted denial of suppression. (*People v Petralia,* 62 NY2d 47; *People v Hollman,* 79 NY2d 181; *People v De Bour,* 40 NY2d 210; *People v Roque,* 99 NY2d 50; *People v Harrison,* 57 NY2d 470; *People v Cantor,* 36 NY2d 106; *People v Sobotker,* 43 NY2d 559; *People v Yancy,* 86 NY2d 239; *People v McRay,* 51 NY2d 594; *People v Woods,* 98 NY2d 627.) II. The Appellate Division incorrectly reversed the resisting arrest conviction based on its determination that the police lacked probable cause when the jury properly considered the testimony of both officers. (*People v Sala,* 95 NY2d 254.)

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Joshua M. Levine* of counsel), for respondent. I. The Appellate Division correctly ruled that the lower court erred in reopening the suppression hearing. (*People v Havelka*, 45 NY2d 636; *People v Burts*, 78 NY2d 20; *People v Bryant*, 37 NY2d 208; *People v Crandall*, 108 AD2d 413, 69 NY2d 459; *People v Dodt*, 61 NY2d 408; *People v Payton*, 51 NY2d 169, 445 US 573; *People v Ynoa*, 223 AD2d 975; *People v Travis*, 162 AD2d 807; *People v Provost*, 50 AD2d 1087; *People v Broughton*, 163 AD2d 404.) II. This Court lacks jurisdiction to revisit the Appellate Division's finding that the first suppression ruling was correct. In any event, the Appellate Division correctly held that the first suppression decision was right, and even the evidence added in the second hearing was insufficient to establish the requisite reasonable suspicion. (*People v William*, 19 NY3d 891; *People v Francois*, 14 NY3d 732; *People v Quinones*, 12 NY3d 116; *People v Silvestry*, 11 NY3d 902; *People v Allen*, 9 NY3d 1013; *People v Pines*, 99 NY2d 525; *People v Reyes*, 90 NY2d 916; *People v Madera*, 82 NY2d 775; *People v Castro*, 70 NY2d 943; *Terry v Ohio*, 392 US 1.) III. The Appellate Division correctly held that, because the initial, correct hearing ruling determined that the police lacked reasonable suspicion, the resisting arrest conviction could not be sustained. (*People v Jensen*, 86 NY2d 248; *People v Alejandro*, 70 NY2d 133; *People v Peacock*, 68 NY2d 675; *People v Parker*, 33 NY2d 669; *People v De Bour*, 40 NY2d 210; *People v Howard*, 50 NY2d 583; *People v Bilsky*, 95 NY2d 172; *People v Evans*, 94 NY2d 499; *People v Nieves*, 67 NY2d 125; *Jackson v Virginia*, 443 US 307.)

## OPINION OF THE COURT

READ, J.

In *People v Havelka* (45 NY2d 636 [1978]), we held that the People, if afforded a full and fair opportunity to present evidence of the dispositive issues at a suppression hearing, are not entitled to a remand after appeal for a reopened hearing. We hold that the principles underlying *Havelka* have equivalent force in the pretrial setting, and preclude a trial judge from reopening a suppression hearing to give the People an opportunity to shore up their evidentiary or legal position absent a showing that they were deprived of a full and fair opportunity to be heard.

## I.

On November 1, 2006, Police Officer Jamal Gungor and Sergeant Chester Indiviglio of the New York City Police

Department's Transit Division were assigned to conduct an anti-crime patrol at the Halsey Street subway station on the L line in Bushwick, Brooklyn. Two days earlier, a gunpoint robbery had taken place on the platform there. The perpetrators were described simply as two black males between 18 and 22 years of age, one light-skinned and approximately five feet six inches to five feet seven inches tall; the other dark-skinned and approximately six feet to six feet one inch tall. The officers, in plainclothes, set out from their home precinct in the Broadway Junction subway station at around 3:30 p.m. and headed to the L train platform. Halsey Street is three stops from Broadway Junction.

While the officers waited on the platform, which was crowded with young people on their way home from school, Sergeant Indiviglio pointed out to Officer Gungor defendant Kevin W., then 17 years old, and another young man, who turned out to be defendant's four-years-older brother, Richard. When the train arrived, the officers boarded with defendant and Richard. Officer Gungor sat on the same bench as the two young men, about five or six feet away. Sergeant Indiviglio sat on the bench opposite, roughly across from Officer Gungor.

The brothers got off the train at the Halsey Street station, followed by the two officers. The officers immediately hailed them, identified themselves as police officers and showed them their shields; they told defendant and Richard that they wanted to ask some questions. Sergeant Indiviglio approached Richard; Officer Gungor, defendant. Defendant refused to show identification. He insisted he had done nothing wrong, told Officer Gungor not to touch him and tried to walk away. Officer Gungor asked defendant to lean against the wall and produce identification and had his hands out towards defendant, which, according to his later testimony, was intended to keep some distance between them and to appeal for calm. Defendant pushed Officer Gungor's hands aside.

At some point, defendant appeared to reach for his waistband. This movement caused Officer Gungor to fear for his safety. He grabbed defendant's left arm and attempted to push him against the wall and apply handcuffs. Defendant resisted. Seeing this scuffle develop, Sergeant Indiviglio forced Richard up against the wall, told him to stay put and turned to help Officer Gungor. But Richard immediately took off, tossing an object onto the platform as he fled the subway station and ran out into the street.

Still trying to restrain defendant, Officer Gungor grabbed at his loose-fitting hooded sweatshirt. Defendant managed to chuck the sweatshirt and his backpack or book bag, and ran off in the same direction as his brother. The officers pursued, leaving the bag and sweatshirt on the platform. Officer Gungor stopped briefly, though, to pick up the object discarded by Richard, which turned out to be an inoperable pistol. He also radioed for assistance.

While the officers were engaged in their ultimately unsuccessful pursuit of the two young men, Transit Division Police Officer Keecha Patrick-Santos arrived at the Halsey Street station. The platform was empty except for defendant's sweatshirt and bag. Officer Patrick-Santos retrieved the bag and opened it. Inside were several items, including a legal pad with notes, a photograph of defendant and a loaded pistol, later determined to be operable.

The bag's contents were later examined by Detective David Sanchez, the Transit Division officer assigned to investigate the Halsey Street station robbery. Using the legal pad notes and the photograph, Detective Sanchez identified defendant and arrested him at his home the following day, November 2, 2006.[1] Defendant was charged with second-degree criminal possession of a weapon (Penal Law § 265.03 [3]) and resisting arrest (Penal Law § 205.30). Detective Sanchez created a photo array which included defendant's image and showed it to Officer Gungor and Sergeant Indiviglio. They both identified defendant in the photo array. They also both identified him in a subsequent lineup.[2]

Defendant moved to suppress the contents of the bag and the identifications, and on May 15, 2007, a *Mapp/Wade* hearing was held before a judicial hearing officer (JHO). The People called Officer Gungor to describe the encounter with defendant and Richard; they did not call Sergeant Indiviglio. Officer Gungor testified that while he and his partner were waiting on the platform, Sergeant Indiviglio observed defendant and Richard

---

**1.** Richard fled the jurisdiction and was not arrested in connection with this case until May 2007. He was initially charged with two counts of second-degree criminal possession of a weapon (Penal Law § 265.03 [1] [b]; [3]) and resisting arrest (Penal Law § 205.30). As the gun Richard allegedly threw away was inoperable, he was ultimately charged with resisting arrest and pleaded guilty to disorderly conduct (Penal Law § 240.20).

**2.** The two victims of the Halsey Street station robbery did not identify defendant in a lineup. Neither defendant nor his brother was ever charged in connection with that crime.

"acting a little suspicious," and pointed them out to Officer Gungor, who had not noticed them before. Officer Gungor described their behavior as "[c]anvassing the area"; he did not claim that defendant and Richard matched the descriptions of the Halsey Street station robbery suspects.

According to Officer Gungor, Sergeant Indiviglio "made eye contact" with him on the train in a way to suggest that the sergeant thought defendant and Richard were armed, and that Officer Gungor should not move until the two young men got off the train. Further, Officer Gungor stated that, aside from occasional glances, he tried not to look at defendant and Richard, and so did not see any of the behavior prompting Sergeant Indiviglio's suspicions.

In a report dated July 25, 2007, the JHO recommended suppression of the physical evidence, but not the identifications. He characterized Officer Gungor's testimony as "sketchy" and "undeveloped," such that he was "unable to determine whether Sergeant Indiviglio believed one of the men to be armed, or whether such belief would be reasonable under the circumstances." As a result, "there existed at the critical juncture no more than a founded suspicion of criminality, justifying exercise of the right of inquiry." And because defendant was entitled to refuse to cooperate with an inquiry, Officer Gungor should not have forcibly detained him. Rejecting the People's argument that defendant abandoned the bag, the JHO concluded that the physical evidence (notably, the gun) seized by the police was the product of an illegal stop.

In a decision and order dated August 1, 2007, Supreme Court adopted the JHO's findings of fact and conclusions of law, and granted suppression. On September 25, 2007, the People moved to reargue. The People's motion papers contained extensive legal argument that the stop was lawful, based on Officer Gungor's testimony. At an appearance on October 25, 2007, defense counsel indicated that he would not be submitting a response because the People had not advanced any new arguments.

At a subsequent appearance on January 23, 2008, Supreme Court, referring to the People's motion to reargue, stated that he would send the motion back to the JHO and "give the DA an opportunity to call Sergeant Indiviglio."[3] Defense counsel did not immediately react upon hearing this, but he objected

---

**3.** The record does not indicate when or how the People requested permission to call Sergeant Indiviglio.

vehemently at the next court date on February 6, 2008. Stating that he might have been laboring under "a misapprehension of what was going on," defense counsel pointed out that the People had filed only a motion to reargue, not a motion for renewal or reopening. The judge commented that he had "treated the motion to reargue as a motion to reargue," but that "[t]o cut to the chase, there was another witness that [the assistant district attorney] wanted to call."[4]

Later that same day, Sergeant Indiviglio testified before the JHO that he noticed defendant and Richard on the platform

> "looking around the station, looking at people. And when they saw me, they seemed to look at me [a] lot in a suspicious manner, kept looking at me, nudging each other, looking at me, which raised my suspicion, what these guys were looking at and why they were looking at me."

He stated that the two young men matched the description of the Halsey Street station robbers, and that when they boarded the train, he positioned himself where he could readily see them because he "felt fear for [his] safety and [his] partner and other people on the train."

Sergeant Indiviglio testified that he was apprehensive because of "the way they were acting, nudging [each other], looking at me." Then, after the train started to move, he "saw Richard make a gesture with his hand, with his fingers, and like a gun, like, I guess, somebody had a gun, pretending they had a gun." Sergeant Indiviglio added that he told Officer Gungor as they were boarding the train that he wanted to stop the two young men and ask them some questions. After observing Richard's "gun signal," he decided a stop, question and frisk was in order, which he indicated to Officer Gungor as they got off the train at the Halsey Street station. According to Sergeant Indiviglio, the brothers were instantly "combative" after he and his partner identified themselves, and Richard pushed him before he attempted to conduct a frisk.

The JHO issued a report dated March 26, 2008, in what he labeled a "[r]eopened Mapp hearing," recommending denial of

---

4. An undated, handwritten notation appears on the back of the motion to reargue, indicating that the hearing was being "re-opened." At the outset of the second hearing, the JHO stated as follows: "I understand that [Supreme Court] granted a motion to *reopen* the hearing in order for the district attorney to produce another witness; is that correct?" (emphasis added). Both attorneys responded in the affirmative.

the suppression motion. Noting that in his earlier report he had found "insufficient justification" for Officer Gungor's detention of defendant, he concluded that the "additional facts provided by Sergeant Indiviglio's testimony," combined with the evidence from the earlier hearing, "viewed in . . . totality," established reasonable suspicion and justified Officer Gungor's actions.

In a decision and order dated March 31, 2008, Supreme Court adopted the JHO's findings of fact and conclusions of law, and denied suppression. Defendant was subsequently convicted at a jury trial of second-degree weapon possession and resisting arrest. On February 18, 2009, Supreme Court adjudicated defendant a youthful offender and sentenced him to five years' probation and community service.

In January 2012, the Appellate Division reversed the judgment on the law, granted suppression, dismissed the indictment and remitted the matter to Supreme Court for purposes of entering an order in its discretion pursuant to Criminal Procedure Law § 160.50 (91 AD3d 676 [2d Dept 2012]).[5] Citing *Havelka*, the court held that Supreme Court erred when it reopened the suppression hearing because the People had been given a full and fair opportunity to present their evidence the first time around.

The Appellate Division concluded that Supreme Court should have granted reargument rather than reopening and, upon reargument, adhered to its initial suppression order because the police lacked reasonable suspicion to stop defendant. And without the gun, the evidence was insufficient to prove defendant's guilt of the weapon possession crime, and there was no probable cause to arrest him or an "authorized arrest," essential elements of the crime of resisting arrest. A Judge of this Court granted the People leave to appeal (19 NY3d 1027 [2012]), and we now affirm.

## II.

In *People v Crandall* (69 NY2d 459, 463 [1987]), we explained that, under an "unbroken thread of precedents," notably including *Havelka*, a case should be sent back for a second *Mapp* hearing when an appellate court determines that the hearing court

---

**5.** Section 160.50 provides generally for record sealing and the return of photographs and fingerprints upon termination of a criminal action or proceeding in a defendant's favor.

denied suppression on a legally erroneous basis. There, the invalidity of an "oral search warrant" on which the suppression court relied was not established until Crandall's appeal. Because the People relied on the presumptive validity of the warrant, they did not offer evidence to sustain an alternative basis for the search. The Appellate Division remitted to allow them to present this evidence, and we affirmed because there was "no incentive or necessity" for the People to do more than they had done at the initial hearing (*id.* at 466). It was the "magistrate's erroneous decision in issuing the 'oral search warrant' " that allowed the People to introduce additional evidence in support of an alternative theory (*id.* at 467). Thus, *Crandall* embodies the general principle that it would be unfair to punish the People for not presenting valid theories or sufficient evidence to justify a search or seizure when good cause exists for the omission. *Havelka* represents the corollary proposition.

In *Havelka*, the suppression motion was denied but the Appellate Division reversed, concluding that the evidence was insufficient, and remanded for a new hearing (*Havelka*, 45 NY2d at 641-642). There was no suggestion that the People had been deprived of a full and fair opportunity to make their case in the initial hearing. The suppression court did not, for example, mislead the People by permitting them to argue an invalid theory or misstate the requirements to be proved. We concluded that a new hearing was not warranted because the evidence initially presented was simply insufficient—i.e., the People have no right to " 'a second chance to succeed where once they had tried and failed' " (*id.* at 643, quoting *People v Bryant*, 37 NY2d 208, 211 [1975]). As we further explained,

> "[d]enial of a rehearing under these circumstances accords with a system that offers a single opportunity for the presentation and resolution of factual questions. If such a practice were not followed, the defendant, having prevailed at the hearing, would be haunted by the specter of renewed proceedings. Success at a suppression hearing would be nearly meaningless, for a second and perhaps a third hearing, could later be ordered" (*Havelka*, 45 NY2d at 643).

Additionally, the People would benefit from implicit and explicit direction from the court about the weaknesses of their case, and so could tailor the presentation accordingly at the subsequent proceeding (*see id.*; *Crandall* at 467; *see also People v Dodt*, 61 NY2d 408, 418 [1984]).

The People contend that *Havelka* and related cases "do no[th-ing] more than prohibit an appellate court from re-opening a hearing after conviction during the pendency of an appeal" and "do not apply in the pretrial context." As we said in *Havelka*, though, "[i]t is the purpose of the rule, rather than the rule itself, to which we are ultimately bound" (*Havelka*, 45 NY2d at 642). The truth-seeking function of a suppression hearing is critical, and there is a strong public policy interest in holding culpable individuals responsible and protecting legitimate police conduct. Finality is important, too, and parties are expected to be prepared for relevant proceedings with their best evidence. Our rule in *Havelka* balances these sometimes competing considerations, which are as evident in the pretrial context as they are on the appeal of a suppression court's decision.

### III.

The People argue that the JHO's first ruling required, as a matter of law, that Sergeant Indiviglio testify; they contend that because the law makes no such demand, they did not think calling the sergeant was necessary. Analogizing this case to *Crandall*, the People then assert they were denied a fair hearing because the JHO incorrectly applied the law and they were misled into thinking that their evidence would be sufficient.

This is simply not the most natural reading of the JHO's report. While he noted that Officer Gungor did not personally witness the suspicious gestures the brothers allegedly made, his ruling ultimately concluded that the proffered testimony was "sketchy" and "undeveloped," and did not establish why Sergeant Indiviglio may have believed defendant and Richard were armed, or whether any such belief was reasonable. In short, the JHO never mandated that Sergeant Indiviglio testify; rather, he held that Officer Gungor's testimony did not satisfy the People's burden to justify the stop and seizure.

As defendant points out, the People had two options: to appeal Supreme Court's decision directly (*see* CPL 450.20 [8]; 450.50), or move to reargue. The People ostensibly chose the latter; they titled their motion as requesting reargument, and insisted that the JHO applied the existing law incorrectly to the evidence presented. Nonetheless, the People sought to reopen the hearing to advance additional evidence, without explaining how they had been denied a full and fair opportunity the first time around, and Supreme Court agreed to a do-over.

The People were certainly aware before the first hearing that Sergeant Indiviglio possessed relevant information. There may

have been some perfectly legitimate reason he was not called, but there is no evidence in the record as to what it might have been. It is also possible, of course, that the People simply miscalculated, inaccurately figuring that Officer Gungor's testimony alone would be good enough to persuade the JHO.

In sum, nothing about the initial hearing robbed the People of a full and fair opportunity to justify the stop and seizure. This case involved a routine weapons possession charge and application of *People v De Bour* (40 NY2d 210 [1976]). The prosecutor certainly knew what his evidentiary burden was and had full access to all the evidence available to establish it (i.e., the officers). Indeed, at the reopened hearing Sergeant Indiviglio added few new facts to the account of the stop, but did supply several choice details concerning his state of mind at each stage of the encounter. It is impossible to know if he would have testified in the same vein if he had been called at the first hearing. But the nature of his later testimony underscores the risk of presentations shaped, whether deliberately or subconsciously, by hindsight.

We have examined the People's other arguments and consider them to be without merit.

Accordingly, the order of the Appellate Division should be affirmed.

SMITH, J. (dissenting). The rule of *People v Havelka* (45 NY2d 636 [1978]) applies when a motion to suppress evidence has been denied, the defendant has been convicted, and an appellate court later finds that the evidence at the suppression hearing failed to justify the challenged police action. *Havelka* holds that in such a case, the People should not ordinarily be given a second chance to make a better record at another suppression hearing. This case is different: It involves not an appellate reversal after conviction, but a suppression court's discretionary decision, before trial, to reconsider its own order granting suppression and to redo the hearing. I would not extend the *Havelka* rule to this sort of case.

*Havelka* states the principle that there should ordinarily be only a "single opportunity for the presentation and resolution of factual questions" (45 NY2d at 643). But this principle has never been an absolute bar to a trial-level court's grant of a party's request for a second chance to make his or her case at a pretrial hearing. Such requests are rarely successful; like other motions for reconsideration of judges' rulings, they are usually

doomed because trial judges can and do expect parties to present their case adequately the first time. But to forbid trial courts from allowing a second chance is to introduce unnecessary rigidity into the system. When—as in this case—a judge is persuaded that the undesirability of altering a pretrial ruling is outweighed by the likelihood that the judge may have been led to a wrong result by an inadequate record, the court's choice to reopen a hearing should rarely be disturbed.

The basically benign nature of this sort of do-over can be illustrated by imagining that the positions of the parties here were reversed. Suppose defendant's motion to suppress had initially been denied after a hearing, and defendant had asked the court to reconsider its denial. Suppose defendant said, in support of his request, that he had mistakenly failed to call a witness who could provide the court with important information. The court might well deny the request for reconsideration, and it would almost certainly not be an abuse of discretion for it to do so. But if the court did choose to reconsider, to hold a new hearing, and to grant suppression, it is very unlikely that an appellate court would reverse its decision, unless it thought suppression was wrong on the merits. I recognize that the same rules do not always apply to the defendant and to the People; there are many occasions in criminal law where the playing field is tilted, quite properly, in the defendant's favor. But I cannot see why this should be one of them.

In *Havelka*, part of the basis for our decision was "the potential for abuse and injustice" (45 NY2d at 643). As we explained:

> " 'A remand with the benefit of hindsight derived from an appellate court opinion offers too facile a means for establishing probable cause after the event' (*People v Hendricks*, 25 NY2d 129, 138). Tailoring the evidence at the rehearing to fit the court's established requirements, whether done unconsciously or otherwise, would surely be a considerable danger. A procedure which fails to shield a criminal defendant from abuses so inimical to the rights guaranteed him should not be tolerated" (*id.* at 643-644).

I cannot say that the sort of abuse that we worried about in *Havelka* is impossible in a case like the present one. Probably, the risk of "tailoring the evidence" exists almost every time the

result of a trial or hearing is set aside, and a new trial or hearing ordered. I do not think the risk is as great in this situation, however, as in *Havelka* and similar cases.

Where, as in *Havelka*, suppression has been denied, the defendant has been convicted, and an appellate court then sends the case back for a new suppression hearing, there may be institutional impulses to make the second hearing come out the way the first one did. When a conviction, probably obtained after much time and trouble, is in danger, there is a strong temptation for police and prosecutors to preserve it by tailoring testimony, and there exists also the natural inclination of the suppression-court judge to adhere to the ruling he or she has already made. But where, as in this case, a judge is asked to reconsider his or her own order, the institutional impulse pushes the other way; a judge's natural response in most such cases is "no."

I see no reason not to rely on the good sense of trial-level judges in deciding whether a pretrial hearing already held should be reopened. I would therefore reverse the order of the Appellate Division.

Chief Judge LIPPMAN and Judges GRAFFEO, PIGOTT, RIVERA and ABDUS-SALAAM concur with Judge READ; Judge SMITH dissents and votes to reverse in an opinion.

Order affirmed.