■ In the Matter of YA-SIN S., a Person Alleged to be a Juvenile Delinquent, Appellant. [996 NYS2d 319]—

In a juvenile delinquency proceeding pursuant to Family Court Act article 3, Ya-Sin S. appeals from (1) an order of fact-finding of the Family Court, Kings County (McElrath, J.), dated August 2, 2013, made after a hearing, finding that he committed acts which, if committed by an adult, would have constituted the crimes of criminal possession of a weapon in the second degree (two counts) and resisting arrest, and committed the offense of unlawful possession of weapons by persons under sixteen, and (2) an order of disposition of the same court, also dated August 2, 2013, which, upon the order of fact-finding and after a dispositional hearing, adjudged him to be a juvenile delinquent and placed him on probation for a period of 24 months. The appeal from the order of disposition brings up for review the denial, after a hearing, of that branch of the appellant's motion which was to suppress physical evidence.

Ordered that the appeal from the order of fact-finding is dismissed, without costs or disbursements, as that order was superseded by the order of disposition and is brought up for review on the appeal from the order of disposition; and it is further,

Ordered that the order of disposition is affirmed, without costs or disbursements.

Police officers testified at a *Mapp/Dunaway* hearing (*see Mapp v Ohio*, 367 US 643 [1961]; *Dunaway v New York*, 442 US 200 [1979]) that on New Year's Eve, December 31, 2012, they each heard multiple gunshots in what was a known high-crime neighborhood; that minutes later, the appellant was observed four or five blocks from the area of the gunshots with a male companion; that the appellant held a bulge that was visible at his waistband which, according to one of the officers, was consistent with the carrying of a gun; that upon seeing Sergeant Lawrence Carson, the appellant immediately fled; that the appellant held his waistband with his right hand as he ran; and that the appellant threw a firearm to the ground with his right hand during the police officers' pursuit. The hearing court expressly credited the testimony of the testifying officers and concluded that, under the circumstances of the case, the officers had reasonable suspicion to believe that a crime had been committed or was about to be committed, and denied suppression. We affirm.

Appellate courts have held under the same or similar factual circumstances that the police have reasonable suspicion to pursue an individual observed with a bulge at the waistband

while in geographic and temporal proximity of gunshots, who then flees from the police (*see e.g. People v Buie*, 89 AD3d 748, 748-749 [2011] [reasonable suspicion where officers heard gunshots and observed defendant in close geographic and temporal proximity flee with one hand holding his waist]; *see also People v Sierra*, 83 NY2d 928, 929-930 [1994]; *People v Martinez*, 80 NY2d 444, 448 [1992]; *People v Haynes*, 115 AD3d 676 [2014] [defendant grabbing waistband and taking flight upon seeing police]; *People v Cruz*, 14 AD3d 730, 731-732 [2005] [bulge at waistband coupled with flight from police]; *People v Byrd*, 304 AD2d 490 [2003] [defendant holding bulge at the waistband fled upon seeing police while keeping a hand on the waistband]; *People v Pines*, 281 AD2d 311, 312 [2001], *affd* 99 NY2d 525 [2002] [defendant bunching up a bubble jacket at the waistband, with a hand cupped underneath as if holding an object, followed by flight upon the approach of police]). The Court of Appeals has recognized that reasonable suspicion, and not probable cause, is the applicable standard in assessing a police stop or detention and that, in determining whether reasonable suspicion exists, a defendant's flight may be considered (*see People v Pines*, 99 NY2d 525, 527 [2002]).

Here, because the pursuit of the appellant was justified, the gun he discarded during the pursuit was not subject to suppression as a result of any unlawful police conduct (*see People v Sierra*, 83 NY2d at 930; *People v Soscia*, 96 AD3d 1081, 1082 [2012]; *People v Buie*, 89 AD3d at 749).

The opinion of our dissenting colleague that the police lacked reasonable suspicion to pursue the appellant, and that the gun evidence should therefore have been suppressed, is primarily based upon her conjecture that "the gunshots did not factor into their decision to approach the appellant and his companion." However, the police testimony is replete with references to the gunshots, and it is clear that such testimony was among the evidence that the Family Court considered. Indeed, the Family Court expressly credited the police officers' testimonies, which necessarily included evidence of their hearing gunshots in the vicinity. The credibility determinations of the hearing court, which actually saw and heard the witnesses testify, is entitled to deference on appeal, and appellate courts do not substitute their own contrary findings of fact unless the findings of the hearing court are clearly unsupported by the record (*see People v Prochilo*, 41 NY2d 759, 761 [1977]; *People v Marcelle*, 120 AD3d 833 [2014]; *People v Taylor*, 120 AD3d 519 [2014]; *People v Jarvis*, 117 AD3d 969 [2014]; *People v Hobson*, 111 AD3d 958 [2013]; *People v Washington*, 108 AD3d 578, 579 [2013]). Al-

though our dissenting colleague places great weight upon the fact that the testimony of the three police officers was not identical with respect to how long it was after they heard the gunshots that they first observed the appellant, the consistency of the record supports the Family Court's determination to credit the police officers' testimonies (*see People v Hill*, 101 AD3d 1772 [2012]; *People v Bennett*, 57 AD3d 912, 913 [2008]; *People v Ellerbe*, 265 AD2d 569, 570 [1999]).

Viewing the evidence in the light most favorable to the presentment agency (*see Matter of David H.*, 69 NY2d 792, 793 [1987]; *cf. People v Contes*, 60 NY2d 620, 621 [1983]), we find that it was legally sufficient to establish, beyond a reasonable doubt, that the appellant committed acts which, if committed by an adult, would have constituted the crimes of criminal possession of a weapon in the second degree under an accomplice liability theory (*see* Penal Law §§ 265.00 [15]; 265.03 [1] [b]; [3]; 20.00). Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*cf.* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord deference to the factfinder's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see Matter of Darnell C.*, 66 AD3d 771, 772 [2009]; *cf. People v Mateo*, 2 NY3d 383 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the Family Court's fact-finding determination with respect to the allegations of the petition that the appellant committed acts which, if committed by an adult, would have constituted the crimes of criminal possession of a weapon in the second degree was not against the weight of the evidence (*cf. People v Romero*, 7 NY3d 633 [2006]).

The appellant's remaining contention is without merit. Dillon, J.P., Hall and Sgroi, JJ., concur.

Barros, J., concurs in part and dissents in part, and votes to dismiss the appeal from the order of fact-finding, grant that branch of the appellant's motion which was to suppress physical evidence, reverse the order of disposition, on the law and the facts, and vacate the order of fact-finding, with the following memorandum: Because the police officers did not have reasonable suspicion that the appellant had or was engaged in criminal activity before they pursued the appellant, the Family Court should have granted that branch of the appellant's motion which was to suppress the gun that the appellant discarded during the unlawful police pursuit.

" 'At a suppression hearing, the Presentment Agency bears the burden of establishing the legality of police conduct in the

first instance' " (*Matter of Jakwon R.*, 110 AD3d 723, 724 [2013], quoting *Matter of Robert D.*, 69 AD3d 714, 716 [2010]).

The majority's assertion that the "consistency of the record supports the Family Court's determination" is belied by the record, which demonstrates, as set forth in greater detail below, significant inconsistencies among the officers, as well as inconsistencies between the testimonies of the officers and the stop and frisk report that was prepared and reviewed by them.

Sergeant Lawrence Carson testified that he and four other officers, members of the anti-crime unit, were patrolling the Bushwick neighborhood in Brooklyn in a marked police van; that he heard "multiple gunshots," which came from behind them, "at least four or five blocks away"; and that the officers drove to the area from which they believed the shots were coming. He testified that the area was a "high crime area which has a lot of gun shootings," and that on the prior New Year's Eve, there had been "a lot of gunshots in that vicinity."

Sergeant Carson acknowledged that the gunshots were not "enough to put it over the radio," because they were not verified by any reports, shell casings, or complaints. He further acknowledged that the "stop, question and frisk report worksheet," which was prepared by Officer Patrick Chilton directly after the incident and which he reviewed, does not mention any hearing of gunshots as indicators of "the sights and sounds of criminal activity."

Approximately five minutes after hearing the gunshots, which was at about 8:50 p.m., Sergeant Carson observed the appellant walking closely next to a companion in the direction of the marked police van. He saw the appellant pause and "grab his waistband," where he observed a "bulge." As Sergeant Carson exited the van to approach the appellant and inquire about the bulge, the appellant and his companion fled. Notably, in the stop and frisk report, under "circumstances which led to stop," the box for "suspicious bulge/object (describe)" is not checked.

Sergeant Carson did not alert any of the other officers about the bulge, or convey any information to them prior to exiting the police van.

Officer Ashley Breton testified that "we heard some shots" and "started driving around looking for . . . where they were coming from." Two to three minutes after hearing the gunshots, he saw the appellant and his companion "[j]ust walking." As soon as Sergeant Carson opened the van door, the appellant and his companion fled.

Officer Chilton testified that "we heard a couple of shots,"

and "drove towards the vicinity of where we thought they were coming from." He testified that he heard the gunshots sometime between 7:30 p.m. and 8:00 p.m., and that the appellant was first observed at about 8:50 p.m. Officer Chilton later testified that he observed the appellant "maybe like ten, twenty minutes" after hearing the gunshots, and then, upon further questioning, testified that it was ten minutes. Officer Chilton testified that he did not report the shots over the radio because he did not know their exact location.

Officer Chilton testified that he merely observed the appellant and his companion walking "shoulder to shoulder" in the direction of the van. Notably, neither Officer Chilton nor Officer Breton observed a bulge in the appellant's waistband.

"Police pursuit of an individual 'significantly impede[s]' the person's freedom of movement and thus must be justified by reasonable suspicion that a crime has been, is being, or is about to be committed" (*People v Holmes*, 81 NY2d 1056, 1057-1058 [1993], quoting *People v Martinez*, 80 NY2d 444, 447 [1992]). "Flight, combined with other specific circumstances indicating that the suspect may be engaged in criminal activity, could provide the predicate necessary to justify pursuit" (*People v Holmes*, 81 NY2d at 1058). "Flight alone, however, or even in conjunction with equivocal circumstances that might justify a police request for information," is "insufficient to justify pursuit because an individual has a right 'to be let alone' and refuse to respond to police inquiry" (*id.*, quoting *People v May*, 81 NY2d 725, 727-728 [1992]; *see People v Haynes*, 115 AD3d 676, 676 [2014]; *People v Carmichael*, 92 AD3d 687, 688 [2012]).

In *People v Smalls* (83 AD3d 1103 [2011]), police officers, while patrolling a building, heard a gunshot coming from the rear of the building. When they responded to the location, they observed the defendant, among a group of other youths, "merely walking away from the building at a normal pace" (*id.* at 1104). The officers followed the youths for three blocks, "during which period none of the individuals behaved in a suspicious manner" (*id.*). When one of the female youths noticed the police officers, she made a gesture and the four male youths fled. The police gave chase, and recovered a gun that they had seen during the pursuit (*see id.*)

In that case, this Court held that "[i]n light of the facts that no group member engaged in suspicious behavior immediately after the shot was heard or during the three-block walk away from the general location of the gunshot, the police lacked reasonable suspicion when they pursued the four males after they fled" (*id.*).

Here, accepting the testimonies of all three police officers, the gunshots were heard anywhere from 2 to 3 minutes, or 1 hour and 20 minutes before the officers observed the appellant and his companion just walking. The gunshots were heard coming from an unspecified location at a distance of at least four or five blocks away.

The facts that the police officers did not mention the gunshots in their stop and frisk report, did not report the gunshots when they heard them, and did not receive any 911 calls or other complaints about gunshots, strongly suggest that, in the minds of the police officers, the gunshots did not factor into their decision to approach the appellant and his companion.

More importantly, there was insufficient temporal or geographical proximity between the officers' hearing of the gunshots and their observation of the appellant to give rise to a reasonable suspicion that the appellant had anything to do with the gunshots (see id.).

As such, the only bases for the police pursuit were Sergeant Carson's observations of the appellant as he walked closely next to his companion at 8:50 p.m. in an urban neighborhood on New Year's Eve, grabbed a bulge in his waistband, and fled when officers suddenly exited a van in pursuit of him and his companion. Such observations do not constitute specific circumstances indicative of criminal activity so as to establish the reasonable suspicion necessary to lawfully pursue an individual (see People v Sierra, 83 NY2d 928, 930 [1994] [the observation of a defendant grabbing at his waistband provides the police "with no information regarding criminal activity"]; People v Haynes, 115 AD3d 676, 676-677 [2014] ["the defendant's 'grab-(bing)' of his 'waistband area' in such a way that it '(s)eemed' to the detectives that the defendant 'had a bulge or something heavy that he was holding on the outside of his garments,' did not constitute specific circumstances indicative of criminal activity . . . even when coupled with the defendant's having made eye contact with the detectives and his flight from the detectives"]; People v Carmichael, 92 AD3d 687, 688 [2012] [a defendant's "tens(ing) of (his) arm around the vicinity of his waistband, even coupled with his flight from the officers, did not constitute specific circumstances indicative of criminal activity" (internal quotation marks omitted)]; People v Cadle, 71 AD3d 689, 689 [2010] [police pursuit of a defendant who was observed walking down the street at night in a high crime area, appearing to be afraid or overly alerted while holding his waistband, was found to be unlawful, requiring suppression of a gun]; see also People v Kennebrew, 106 AD3d 1107, 1109 [2013]

[noting that an unidentifiable bulge in the waistband is susceptible of both an innocent as well as a guilty explanation]).

Since the officers' pursuit of the appellant was unlawful, and the appellant's disposal of the weapon during the pursuit was precipitated by the illegality and was not attenuated from it, the discarded physical evidence should have been suppressed (*see People v Carmichael*, 92 AD3d at 688; *People v Cadle*, 71 AD3d at 689). Without that evidence, there could not be sufficient evidence to prove that the appellant committed acts which, if committed by an adult, would have constituted the crimes of criminal possession of a weapon in the second degree and resisting arrest, and the offense of unlawful possession of weapons by persons under sixteen (*cf. People v Kevin W.*, 91 AD3d 676, 678 [2012], *affd* 22 NY3d 287 [2013]).

The cases cited by the majority are inapposite. In *People v Buie* (89 AD3d 748 [2011]), the police officers in plainclothes heard gunshots, and "within seconds" came across the defendant, who was with a group of men in the immediate vicinity where the gunshots were heard. Upon being approached by one of the officers, the defendant split from the group and fled "with his left hand swinging freely and his right hand pinned to his waist" (*id.* at 748). In contrast, here, there was an insufficient nexus between the hearing of the gunshots and the observation of the appellant grabbing at a bulge in his waistband to reasonably suspect that the appellant was involved in criminal activity.

In *People v Martinez* (80 NY2d 444 [1992]), the police observed, among other things, a defendant "removing an instrument known to the police to be used in concealing drugs" in a "narcotics-prone neighborhood" (*id.* at 448 [internal quotation marks omitted]). Here, the bulge in the appellant's waistband was unidentified prior to the police pursuit.

In *People v Byrd* (304 AD2d 490 [2003]), the Appellate Division, First Department, affirmed the denial of a defendant's suppression motion on grounds including that the "presence of a weapon was strongly suggested by a large bulge in defendant's waistband area, coupled with the fact that defendant was walking with his hand *in* his waistband over the bulge," and that the defendant fled "keeping his hand in its suspicious position as the police merely got out of their car" (*id.* at 490 [emphasis added]). Here, there was no testimony that the appellant kept his hand *in* his waistband over the bulge, nor was there a description of the bulge to suggest the presence of a weapon.

In *People v Pines* (281 AD2d 311 [2001], *affd* 99 NY2d 525 [2002]), the police officer observed the defendant "looking

around nervously," saw his eyes bulge out upon seeing the officers' vehicle, observed the defendant bunch up "his bubble jacket on the right side, at the waist area, with his hand cupped underneath it, as if he were cradling or holding an object," and saw him walk sideways "shielding his right side from view, still holding his jacket on that side in a bunched-up fashion" (*id.* at 311-312). In contrast, here, the officers observed nothing more than the appellant grab at an unidentified bulge prior to the pursuit.

Since the Family Court erred in denying that branch of the appellant's motion which was to suppress the gun, I respectfully concur in part and dissent in part, and vote to dismiss the appeal from the order of fact-finding, grant the aforementioned branch of the appellant's motion, reverse the order of disposition, and vacate the order of fact-finding.