People v Colon (2025 NY Slip Op 51247(U))

[*1]

People v Colon

2025 NY Slip Op 51247(U)

Decided on August 7, 2025

Supreme Court, Bronx County

Bowen, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 7, 2025
Supreme Court, Bronx County

The People of the State of New York

against
Kenneth Colon, Defendant.

Ind No. 73443-24

Scott G. McDonald, Assistant District Attorney, Bronx County, for the People 
Edie Joseph and Ruth Hamilton, The Bronx Defenders, for Defendant

E. Deronn Bowen, J.

Summary
The People's application to reopen the suppression hearing is GRANTED in accordance with this decision and order.
 I. Introduction and Procedural History Overview
Defendant, Kenneth Colon, stands charged in an indictment with criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]) and other related charges. By decision and order dated September 27, 2024, the court (Steven Hornstein, J.) ordered a Dunaway/Huntley/Mapp/Boodle suppression hearing to be held prior to trial.
On July 9, 2025, the parties appeared before this court. The People explained that the arresting official in this matter, then-NYPD Police Officer and now-Detective Brian Estevez (AO), was unavailable to testify at the suppression hearing due to an unrelated line-of-duty injury. Although the AO was tentatively due to return to duty in the coming days or weeks, the People opted instead to substitute the testimony of the AO's then-partner, NYPD Police Officer Clairet Cordero Lantigua (PO).

II. The Suppression Hearing and Subsequent Proceedings
The suppression hearing took place before this court on July 15, 2025. The PO was the sole prosecution witness. Also admitted into evidence, with defense consent, were the PO's body-worn camera (BWC) footage of the events surrounding defendant's arrest and nearby surveillance camera footage of the same. The defense elected to not call any witnesses or to present other hearing evidence.

A. Suppression Hearing Evidence
The PO, a nearly seven-year veteran of the NYPD, has for a little over a year been assigned to the Citywide Community Response Team, which addresses "mostly community complaints. . . . [W]hatever the community is concerned for—we are deployed there to address those things, whatever they may be." In the late evening hours of July 27-28, 2024, the PO was on overnight vehicular patrol with the AO and a third officer in an unmarked police vehicle. The AO was the driver; the PO was seated behind the AO; and the third officer sat in the front passenger seat (0:01).[FN1]
The PO testified that all three officers were dressed "in uniform," which includes "khaki" "tactical pants, our duty vest and our—a shirt like a dark shirt or tactical shirt underneath" (1:03).
At approximately 1:21 a.m. on July 28, 2024, the officers were driving northbound on Elder Avenue, a two-way street in Bronx County, NY (0:05). It was dark outside, but the area was illuminated by streetlights and lighting from nearby commercial establishments (0:31). The PO testified that she first observed defendant, whom she identified during the hearing, "[p]robably like 10 feet" away. Defendant was on the sidewalk on the opposite side of Elder Avenue, to the officers' left, walking in the same direction the officers were traveling in their vehicle. Other than a row of parked vehicles, nothing obstructed the PO's view of defendant (0:57).
From a distance of "[l]ess than five feet," the PO first observed that defendant "was carrying a bag, black shopping bag" that she described as "heavy." As a follow-up question on direct examination the PO was asked, "Besides the relative weight of the bag, something that was heavy, were you able to observe anything else about the bag?" The PO responded, "No," and provided no additional descriptors about the black grocery bag or its heavy contents, neither of which defendant can be seen holding on either the BWC footage or the surveillance footage. Other than the "heavy" grocery bag, the PO did not point to anything else about defendant's presence on the sidewalk as having been, in her mind, indicative of criminality, unusuality or other necessity. The PO did infer that the AO also was "homed in on" defendant, as the AO had "instinctually slowed the vehicle down and we made our observations from the car." This "slowing down" is reflected in the BWC footage (0:18-0:25 [the police vehicle slows down at 0:21]). No hearing evidence was presented, however, concerning what observations, if any, were made by the AO or the third officer.
The PO did testify that, after she had observed defendant for approximately 20 seconds, she heard the AO call out to him, "Do you have anything in that bag, brother?" (S 0:05-0:07). Responses of "I don't got nothing" and "nah" can be heard soon thereafter (S 0:09-0:12); the PO attributed both statements to defendant. A clanging sound is heard next (S 0:12)—the PO described it as "the clank of metal hitting the ground"—and an individual, presumably defendant, is seen on the surveillance footage walking on the sidewalk without a bag (S 0:14-0:16).
The PO testified that she exited the vehicle (0:55); approached the sidewalk area where the clank was heard (0:56-1:00); saw defendant's black grocery bag lying on the ground (1:00); and felt the bag without opening it (1:02). The PO testified that, she felt "a firearm . . . [b]y the weight. I felt the barrel, the handle. I carry a firearm; I recover firearms. There was nothing in [*2]the bag besides the firearm." The PO called out to her partners, who seized and arrested defendant (1:05).

B. Post-Hearing Proceedings
The defense elected to not cross-examine the PO, and the People rested without calling any other witnesses or presenting any other evidence. The defense rested without putting forth an affirmative case. Immediately after closing the evidentiary portion of the hearing, this court—then, as now, assuming arguendo the PO's testimonial credibility [FN2]
—expressed pointed doubts as to whether her observations justified any police intrusion at all into defendant's sphere of personal privacy. A lively discussion ensued, but no final decision was pronounced respecting the defense suppression application. Rather, this court permitted the parties' to file written briefs prior to the issuance of a decision.
Later the same day, July 15, 2025, the People emailed "requesting the Court's permission to reopen the hearings so [that the AO] can testify." Defendant responded by email later the same day to "respectfully request" that this court "deny the prosecution's application to reopen the hearing." This court ordered oral argument, which took place two days later, on July 17, 2025, which was a day of even livelier discourse than what had transpired during the suppression hearing. Counsel on both sides are to be commended for their preparedness on such short notice, as well as for the intellectualism and the engaging advocacy for their respective positions.[FN3]
This court mentioned then—and it deserves repeating now—that presiding over such arguments is in large part "why I love being a judge."

III. Analysis of the Current Suppression Hearing Evidence [FN4]

"The Court of Appeals in [People v De Bour (40 NY2d 210 [1976] ) ] set forth a graduated four-level test to determine whether police-initiated street encounters are lawful. At a level-one street encounter, a police officer is permitted to approach and request information from an individual. This requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality. . . . Level two, a common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot. Level three allows an officer to forcibly stop and detain an individual and requires a reasonable suspicion that the individual has committed, is committing, or is about to commit a felony or misdemeanor. Level four occurs when an individual is arrested and requires probable cause to believe that the individual has committed a crime. Each progressive level authorizes greater police [*3]intrusion and consequently requires escalating suspicion by the officer" (People v Walker, 237 AD3d 102, 105-106 [2025] [internal citations omitted]; see generally De Bour, 40 NY2d 210).
Preliminarily, the People's reliance on a quotation from People v Gates (31 NY3d 1028 [2018]), that the "difference between level one and level two . . . is a subtle one, often based on intangibles discernable only to the eyes of a trained police officer" (id., at 1030 [internal quotation marks omitted]), is undermined by the fact that it is found in a lone-judge dissent from a four-sentence memorandum opinion. The memorandum makes clear that the dissenter's "question[ing of] the continued utility of the De Bour paradigm for analyzing encounters between police and members of the public" was "not presented" by the litigants (id., at 1029).
Granted, the Gates dissenter's remark is not incorrect in some cases. There certainly are circumstances in which trial and appellate courts have wrangled over the fact-specific question: What De Bour-level intrusion is this (see id., at 1030-1031). However, the People's promotion of a per se rule—that in all De Bour inquiries the line between the first two levels is necessarily subtle—is rejected as a logical fallacy of overgeneralization or hasty generalization (see Carlos Fuentes, Irrationally Yours—An Introduction to Logical Fallacies, Contingencies [American Academy of Actuaries March/April 2021 Issue] [March 1, 2021] ["Hasty or [f]aulty [g]eneralization refers to conclusions reached based on a few examples that support a statement"] [emphasis omitted], available at 
https://actuary.org/article/irrationally-yours-an-introduction-to-logical-fallacies/ [last accessed August 6, 2025]).
Contrary to the People's insistence that the legality of the police intrusion here is a "close call," a De Bour analysis of the current, presumably credible hearing evidence,[FN5]
presents no close-call issues of subtlety whatsoever. A De Bour level-one
"request for information is a general, nonthreatening encounter in which an individual is approached for an articulable reason and asked briefly about his or her identity, destination, or reason for being in the area. If the individual is carrying something that would appear to a trained police officer to be unusual, the police officer can ask about that object. A pillowcase containing a television set is clearly unusual. A zippered blue bag carried by an individual about to board a bus is not" (People v Hollman, 79 NY2d 181, 191 [1992]).
Here, the suppression hearing evidence, as it currently stands, does not justify the AO's sudden questioning of defendant. It is not unusual for New Yorkers to carry the same sort of black grocery bag that defendant carried. Indeed, bags of this type are commonly distributed to customers in bodegas, general stores and grocery stores throughout New York City. That defendant's bag contained a nondescript, heavy object, absent any other indicia of criminality, unusuality or other necessity, did not serve as a lawful basis for the police to initiate even a level-one De Bour interaction with him. The police simply are not authorized to initiate even a level-one encounter with a private civilian absent any reasonable basis for doing so.
Yet, the AO's inquiry at the outset about the contents of defendant's bag surpassed even the limited scope of a level-one request for information about matters such as "identity, destination, or reason for being in the area" (id.; see Walker, 237 AD3d at 105 ["It is well established that when evaluating police action during street encounters, the court must determine [*4]whether it was justified at its inception and reasonably related in scope to the circumstances at the time"]). A police official's request to disclose the contents of one's grocery bag, bookbag, purse, briefcase, fanny pack, jacket pocket, box, glove compartment, etc., while perhaps not as intimidating as an outright search, is intrusive enough to place such questioning squarely in the ambit of a level-two inquiry for which "there must exist at that moment a founded suspicion that criminal activity is present" (De Bour, 40 NY2d at 215; see People v Garcia, 20 NY3d 317, 324 [2012] ["a police officer who asks a private citizen if he or she is in possession of a weapon must have founded suspicion that criminality is afoot"]). Additional facts about which the PO testified bolster the objective reasonableness of viewing the AO's questioning of defendant as a level-two De Bour inquiry indicative of criminal suspicion, including that the police had been slowly following him in an unmarked vehicle at approximately 1:21 a.m. from a distance of only a few feet just prior to the questioning.
This court rejects the People's proposition that the AO's choice to ask defendant about his grocery bag's contents, rather than explicitly demanding to search the bag, renders the encounter into something less than a level-two De Bour interaction.
"No matter how calm the tone of [the] officers may be, or how polite their phrasing, a request to search a bag is intrusive and intimidating and would cause reasonable people to believe that they were suspected of criminal conduct. These factors take the encounter past a simple request for information" (Hollman, 79 NY2d at 191-192).
In any event, less accusatory questions than the one asked by the AO here have been deemed a level-two De Bour inquiry. In People v Fields (257 AD2d 387 [1999]), a narcotics officer "asked defendant whether anyone had asked him to carry anything on the bus for him, obviously referring to the black gym bag that defendant had placed on the seat next to him with his hand over it" (id., at 388). The First Department explained that,
"[w]hile this question did not necessarily amount to a specific question about the ownership and contents of the gym bag, it was a more intrusive type of question, more accusatory in nature and focusing on the possible criminality of the person approached. This is the definition of a Level-II type inquiry" (id.).
A fortiori, in the instant matter, the AO's "specific question about the ownership and contents of the [grocery] bag, . . . a more intrusive type of question [than was asked by the narcotics officer in Fields], . . . is the definition of a Level-II type inquiry" (id.). Further, the AO's level-two inquiry here was, like in Fields, "improper because at the time the officer asked it, he lacked a founded suspicion that criminal activity was afoot" (id., at 389).
"The four-tiered [De Bour] method for analyzing police encounters gives officers acting in their law enforcement capacity leeway in approaching individuals for information. It does not, however, permit police officers to ask intrusive, potentially incriminating questions unless they have founded suspicion that criminality is afoot" (Hollman, 79 NY2d at 192). Here, as has been explained, the prosecution has presented no evidentiary proof that any objective indicia of criminality, unusuality or other necessity were attendant with defendant's sudden, level-two questioning. In fact, as has also been explained, per the hearing evidence the AO was not authorized to initiate any De Bour level of communication with defendant whatsoever. In sum, from the hearing evidence as it currently stands, and presumed credible for purposes of this decision and order, the AO improperly initiated a level-two De Bour inquiry of defendant absent an objective basis for even a level-one request for information.

IV. The People's Application to Reopen the Suppression Hearing
The parties agree, correctly, that this court has the discretionary authority to reopen the suppression hearing, as "no decision on the motion has been rendered by the hearing court" (People v Cook, 34 NY3d 412, 419 [2019]; see People v Gnesin, 127 AD3d 652, 653 [2015]).The parties are, of course, at odds over whether this court should exercise its authority.
Defendant validly asserts that, when announcing ready to proceed with the suppression hearing, the People, at minimum, should have known that the PO's observations did not come near to supporting the AO's level-two inquiry here. Consequently, defendant continues, the prosecution should not now—after this court has pulled the not-so-secret De Bour cat fully out of the bag—be permitted an opportunity to correct the poor strategic decision to proceed with the PO's testimony rather than to wait for the AO to be cleared from medical leave in likely a few days to a few weeks.[FN6]
Certainly, "the People's motion to reopen is less justifiable here than in cases where the need to prove a particular element was unexpected" (People v Whipple, 97 NY2d 1, 8 [2001]). That being said, and "while a better explanation for their omission would certainly have enhanced the merit of the People's motion, the inadequacy of their excuse does not preclude a cure as a matter of law" (id.).
Tacking onto the Whipple point, the People invoke a strong public interest in full fact-finding at a suppression hearing. "The truth-seeking function of a suppression hearing is critical, and there is a strong public policy interest in holding culpable individuals responsible and protecting legitimate police conduct" (People v Kevin W., 22 NY3d 287, 296 [2013]). Moreover, "[i]t is not guilt or innocence that is at stake in a suppression hearing, but rather whether the police had lawful cause to take the challenged action" (Cook, 34 NY3d at 420).
Based upon the PO's limited observations, and absent evidentiary information about the AO's direct observations, if any, it would appear that the AO may have engaged in an unlawful stop and frisk action against defendant (see Shayla Colon, The Persistent Problem of Stop and Frisk, NY Times, Feb. 4, 2025, available at 
https://www.nytimes.com/2025/02/04/nyregion/the-persistent-problem-of-stop-and-frisk.html
[last accessed August 6, 2025]). However, if "the [People] possess [ ] evidence showing that, in fact, no official misconduct occurred, the interests of justice militate strongly in favor of considering this evidence even if it is belatedly brought to the [suppression] court's attention" (Cook, 34 NY3d at 420-421 [internal quotation marks omitted] [all brackets in the original]).
Recently, this court, sitting as lower Criminal Court, reasoned in the context of a purported discovery violation, that it "would be unreasonable" under the facts of that case "to hold the prosecution accountable for apparent NYPD oversights or errors that delayed the sharing of [ ] discoverable material with the defense" (People v Loja, 86 Misc 3d 318, 322 [Crim Ct, Bronx County 2025]). The converse is also true. On the facts here, to evaluate the lawfulness of the police action on an incomplete evidentiary record would (1) run counter to the "strong public policy interest" voiced by the Court of Appeals in Kevin W. of "holding culpable individuals responsible and protecting legitimate police conduct" (22 NY3d at 296) and (2) be unreasonably contrary to the "interests of justice" expressed by the Court of Appeals in Cook that "militate strongly in favor of considering this evidence" (34 NY3d at 420). That being said, before reopening the suppression hearing to receive additional evidence, this court must be assured that, at this stage of the proceedings, doing so will not unduly prejudice defendant.
Defendant submits that reopening the suppression hearing would unduly prejudice him [*5]due to the possibility, certainly nonfrivolous, that the AO could tailor his testimony to address this court's already articulated De Bour concerns (see Cook, 34 NY3d at 420 ["if the suppression court 'tips its hand' about perceived weaknesses in the People's proof after the People have rested, that insight might create a risk of tailored testimony at the reopened hearing"]). The People respond with an assortment of prior memorializations of the AO's observations of defendant, including NYPD documents and transcripts of the AO's testimony both before the grand jury on August 1, 2024, and at defendant's parole revocation preliminary hearing on September 25, 2024. The People argue that these memorializations (1) prove the existence of additional evidence material to the question of the legality of the police action and (2) prevent the AO from tailoring any future testimony.
A "hearing court [is] more than up to the task of evaluating the risk of manufactured testimony" (People v Brujan, 104 AD3d 481, 481 [2013]). Additionally, this court has reviewed the prior memorializations of the AO's observations and agrees with the People that these documents stand as a formidable check against tailored testimony.[FN7]
Consequently,
"[n]o perceptible prejudice to the defense is evident on this record. While it may have been [this court's] objection that alerted the People to the missing proof, one of the purposes of requiring timely and specific motions and objections, a requirement applicable to suppression hearings, is to provide the opportunity for cure" (People v Bedard, 64 Misc 3d 144[A], 2019 NY Slip Op 51295[U], *3 [App Term, 2d Dept, 9th and 10th Jud Dists 2019] [internal quotation marks omitted]; cf. People v McCorkle, 111 AD3d 557, 557-558 [2013]; People v Cestalano, 40 AD3d 238, 239 [2007]).
The Court of Appeals laid out in Cook and Kevin W., respectively, the "interests of justice" and "strong public policy" support for amassing as complete a record as possible upon which to evaluate the lawfulness of police conduct, "even if [new evidence] is belatedly brought to the [suppression] court's attention" (Cook, 34 NY3d at 420-421 [internal quotation marks omitted]). Furthermore, reasonable documentary safeguards against tailored testimony exist here. Accordingly, the People's application to reopen the suppression hearing for this court's consideration of the AO's testimony and related evidence is GRANTED. The reopened hearing is to be scheduled expeditiously in consultation with the parties.
Defendant's election at the July 15, 2025, suppression hearing to not cross-examine the PO was a reasonable strategic choice in the absence of the AO's testimony. Defendant understandably may wish to reconsider that strategy in light of this court's decision to reopen the suppression hearing and to admit the AO's testimony. Accordingly, upon reasonable notice by the defense, the People are ORDERED to make the PO available at the reopened suppression hearing for continued testimony, beginning with her cross-examination by the defense.
THIS CONSTITUTES THE DECISION AND ORDER OF THIS COURT.
Dated: August 7, 2025
Bronx, New York
E. Deronn Bowen, A.J.S.C.

Footnotes

Footnote 1:Parenthetical times correspond to the external time stamp for NYPD Police Officer Clairet Cordero Lantigua's (PO) body-worn camera footage of the incident surrounding defendant's arrest. Parenthetical times preceded with an "S" correspond to the external time stamp for the surveillance camera footage of the same.

Footnote 2:No final decision on the defense suppression application is being issued, as the parties' respective written arguments on that point are placed in abeyance pending the receipt of any new evidence at the reopened hearing, pursuant to this decision and order. For purposes of this decision and order, this court assumes without deciding—as it did during the parties' July 15 and July 17, 2025, oral arguments—the PO's credibility and the factual correctness of her hearing testimony.

Footnote 3:This included a comically theatrical rendition of feigned surprise by ADA Scott G. McDonald that, in this court's humble opinion, earned him at minimum a cameo opposite the incomparable Viola Davis.

Footnote 4:See ante n 2.

Footnote 5:See ante n 2.

Footnote 6:This court is unaware whether the third officer in the vehicle with the arresting officer (AO) and the PO was ever assessed by the People as a viable alternative hearing witness.

Footnote 7:This court takes no position, and issues no decision, as to whether the memorializations of the AO's observations, if true, would authorize the De Bour inquiry that took place here. The court notes only the existence of additional, material evidence concerning the AO's observations of defendant.